# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CA-00048-SCT

### CONSOLIDATED WITH

## NO. 97-CA-01107-SCT

### CONSOLIDATED WITH

## NO. 97-CA-01469-SCT

*HAROLD G. McNEIL*

*v.*

*LINDA L. HESTER AND TERRY O. HESTER AS EXECUTORS OF THE ESTATE OF NELBERT P. HESTER, DECEASED AND INDIVIDUALLY*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/07/1997 |
| TRIAL JUDGE: | HON. JOHN C. ROSS, JR. |
| COURT FROM WHICH APPEALED: | TISHOMINGO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | HAL H. H. McCLANAHAN, III |
| | ROGER K. RUTLEDGE |
| ATTORNEY FOR APPELLEES: | PHIL R. HINTON |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS AND ESTATES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; AND REMANDED- 02/10/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/2/2000 |

## BEFORE SULLIVAN, P.J., SMITH AND MILLS, JJ.

## SMITH, JUSTICE, FOR THE COURT:

¶1. This appeal arises from a dispute between the co-executors, Terry Hester and Linda Hester, and a devisee, Harold McNeil, of the estate of Nelbert P. Hester regarding the ownership of certificates of deposit held jointly by Nelbert Hester and the co-executors at the time of Nelbert Hester's death. The case is appealed by McNeil from the order of the Chancery Court of Tishomingo County, Mississippi, denying McNeil's request for an accounting, for removal of the co-executors, for payment of all principal and interest accrued on the certificates of deposit, and for attorneys' fees. Consolidated with the appeal from the chancellor's denial of the requested relief are the appeals from the chancellor's denial of McNeil's motion to

correct the record and from the chancellor's denial of McNeil's motion to vacate the chancellor's order authorizing the closing of the estate and discharging the co-executors.

## STATEMENT OF FACTS

¶2. Nelbert P. Hester resided on a farm in Tishomingo County with his three sisters, Grace Hester, Hettie Hester, and Reba Hester. None had children. Reba Hester was disabled and required the care of her siblings. Grace died in 1985, and on May 13, 1986, and Nelbert and Hettie began planning their estates so that Reba would be taken care of if Nelbert and Hettie died before Reba. In 1986, Nelbert and Hettie executed mirroring wills. According to the wills, the entire estate was left to co-executors Terry Hester and Linda Hester, nephew and niece, respectively, of Nelbert and Hettie, for the benefit of Reba. The wills also provide that if Reba predeceased Nelbert, which she did, Terry and Linda were to divide the proceeds of the estate equally between thirteen devisees. The will waives any requirement of an accounting. Terry and Linda are among the thirteen devisees, as is the Appellant, Harold McNeil.

¶3. Between 1985 and Hettie's death in November 1990, Nelbert and Hettie created numerous certificates of deposit with Iuka Guaranty Bank, Bank of Red Bay, Alabama, and People's Bank. Some of the certificates of deposit were payable to Nelbert or Hettie, some were payable to Nelbert or Hettie or Linda, some were payable to Nelbert or Hettie or Terry, and one was payable to Nelbert or Linda or Terry. Nelbert and Hettie also placed Terry and Linda on their checking account and safe deposit box, both at the Iuka Guaranty Bank. Neither Terry nor Linda opened the safe deposit box until after Nelbert's death, and neither wrote checks on the checking account until after Nelbert's death.

¶4. At the time of Hettie's death in November 1990, the following certicates of deposit existed:

1. CD No. 17301 in the amount of $52,769.07 and in the name of Nelbert or Hettie. Iuka Guaranty Bank.

2. CD No. 896186 in the amount of $15,165.84 and in the name of Nelbert or Linda or Terry. Peoples Bank, Iuka, Mississippi.

3. CD No. 13963 in the amount of $41,766.22 and in the name of Nelbert or Hettie or Linda. Bank of Red Bay, Red Bay, Alabama.

4. CD No. 13972 in the amount of $27,105.01 and in the name of Nelbert or Hettie or Terry. Bank of Red Bay.

5. CD No. 6226 in the amount of $27,760.38 and in the name of Hettie or Nelbert. Iuka Guaranty Bank.

6. CD No. 7806 in the amount of $29,458.03 and in the name of Hettie or Nelbert or Linda. Iuka Guaranty Bank.

7. CD No. 12598 in the amount of $26,000.00 and in the name of Nelbert or Hettie. Iuka Guaranty Bank.

8. CD No. 13602 in the amount of $32,000.00 and in the name of Nelbert or Hettie. Iuka Guaranty Bank.

9. CD No. 14291 in the amount of $13,919.02 and in the name of Hettie or Nelbert. Iuka Guaranty Bank.

10. CD No. 14554 in the amount of $21,500.00 and in the name of Hettie or Nelbert. Iuka Guaranty Bank.

¶5. Days after Hettie's death, Nelbert renewed the certificates of deposit at Iuka Guaranty Bank. The two certificates of deposit at the Bank of Red Bay remained, as did the certificate of deposit at Peoples Bank. In 1992, Nelbert renewed the certificates of deposit at Iuka Guaranty Bank into No. 20269 in the amount of $58,437.71; No. 20270 in the amount of $55,132.25; No. 20271 in the amount of $58,437.71; and No. 20272 in the amount of $55,132.24, all in the name of Nelbert or Terry or Linda. Also in 1992, Nelbert created certificate of deposit number 20308 at Southbank, Iuka Mississippi, in the amount of $29,000.00 and in the name of Nelbert, Terry or Linda; and certificate of deposit number 14870 at the Bank of Red Bay in the amount of $27,296.57 and in the name of Nelbert or Linda.

¶6. As of November 1992, the value of the certificates of deposit totaled approximately $365,000. Both Terry and Linda testified that Nelbert never consulted them regarding his financial affairs and that neither had knowledge of the certificates of deposit until they opened the safe deposit box after Nelbert's death.

¶7. Reba passed away in February of 1993, and Nelbert died days later on March 1, 1993. At Nelbert's death, the estate consisted of Nelbert's checking account, which contained roughly $10,000; Nelbert's car; personal and household items; and the family farm. The crux of the dispute at hand concerns whether the jointly payable certificates of deposit pass with Nelbert's estate. Terry and Linda maintain that they are the owners of the certificates of deposit. Harold McNeil appeals, inter alia, the chancellor's refusal to declare a constructive trust of the certificates of deposit and the interest accrued thereon.

¶8. Upon learning of Nelbert's death, Terry and Linda opened the safe deposit box to which Nelbert had given them keys. In the box, they found Nelbert's will as well as the certificates of deposit. Prior Nelbert's funeral, Terry and Linda consulted attorney Barry Finch about the administration of the will. Based on their consultation with Finch, Terry and Linda believed the estate consisted only of the farm and house, household items, and car - not the certificates of deposit. Terry read the will to the devisees the day of Nelbert's funeral. On March 9, 1993, the Honorable John C. Ross, Chancellor of the Chancery Court of Tishomingo County, Mississippi, granted the Petition for Letters Testamentary filed by Terry and Linda, and the will was admitted to probate.

¶9. Finch died in May 1993, and the co-executors proceeded without benefit of counsel from May 1993 until May 1994. Terry and Linda used Nelbert's checking account, a non-interest bearing account, to hold estate funds until they opened an estate account in May 1994. In June 1993, Terry and Linda conducted two private sales of household and personal items. Proceeds from the sales totaled $9,568.25, which Linda deposited in the joint checking account.

¶10. On January 6, 1994, Terry and Linda created a certificate of deposit in the amount of $46,074.16 and in the name of the Nelbert's estate. The money for certificate of deposit came from the Southbank certificate of deposit created by Nelbert and from the checking account. Terry and Linda testified that they created the certificate of deposit with the intent to give the other devisees a gift from the proceeds of the certificates of deposit which, they believe, they own. However, the two testified that they later discovered that by making a gift they would incur tax penalties, so they renewed the certificate of deposit on July 7,

1994, but only in their own names. Linda testified that at the time the certificate of deposit was created, she and Terry believed that the entire amount taken from the checking account, $17,000, consisted of their own personal funds. They later realized, however, that about $4,000 of the $17,000 belonged to the estate. Linda testified that any co-mingling of funds was corrected, and the money was returned to the estate.

¶11. In April 1994, Terry and Linda called a meeting of devisees to discuss the sale of the farm. At the meeting, Terry announced that there was approximately $390,000 in joint certificates of deposit. Terry testified that he did not, at that time, consider the money to be part of the estate. Montez Hannon, a devisee present at the meeting, testified that she understood Terry's announcement to mean that the certificates of deposit were part of Nelbert's estate. Harold McNeil, also present, testified that he just assumed the amount would be divided, but that Terry never stated that the certificates of deposit belong to the estate.

¶12. The farm was sold in May 1994. The attorney who handled the closing recommended to Terry and Linda that they set up an estate account. It was not until May 1994 that Terry and Linda actually obtained legal counsel, and at that time a separate estate account was established. The proceeds from the farm sale, totaling $150,250, were deposited in the estate account and then distributed.

¶13. In June of 1994, Terry and Linda deposited $105,991.91 in the estate account. The source of this money was the proceeds from three of the certificates of deposit at the Bank of Red Bay. Terry and Linda testified that it was, again, their intent to distribute to devisees as a gift, but that they decided against making the gift because of the tax that they would incur. Terry and Linda then removed the money from the estate account and put it back in the joint account at Red Bay. That same day, they cashed the jointly held certificates of deposit at the Bank of Red Bay. Linda deposited her check in a certificate of deposit, payable to Terry or Linda, in the Federal Credit Union in Memphis, Tennessee, for $75,637.39. Terry received $32,043.73, and he procured a certificate of deposit at First American National Bank in the name of Terry and Linda.

¶14. On July 13, 1994, Terry and Linda filed a Petition to Discharge Co-Executors and to Close the Estate. They mailed to the devisees a Joinder and Waiver of Process and Entry of Appearance by which, when signed, each devisee waived process and joined in the petition to close the estate and discharge the co-executors. Harold McNeil refused to sign the joinder and waiver and sought the advice of counsel, Joseph Rutledge. Rutledge requested copies of tax returns filed on behalf of the estate, copies of all banking statements and certificates of deposit in which Nelbert had an interest, a statement of indebtedness, and a statement of the sale of any real and personal property of Nelbert. In September 1994, counsel for the executors, Elizabeth Brown, sent Rutledge the tax returns, bank statements, an accounting of all expenses incurred, a list of all assets in the estate, and copies of the certificates of deposit with the amounts blackened out. Also included was a letter from Iuka Guaranty Bank attesting to Terry and Linda's joint ownership of the four certificates of deposit at that bank.

¶15. Rutledge and McNeil scheduled a meeting with Ms. Brown and Terry Hester. McNeil was informed at the meeting of the amounts of the certificates of deposit. Terry told McNeil that if McNeil would sign the joinder and waiver, Terry and Linda might be willing to make a gift of a portion of the value of the CDs. However, Linda did not agree with the offer, and the offer was withdrawn.

¶16. McNeil filed a Motion for Accounting and Other Relief on February 10, 1995. In that motion, he requested an accounting and inventory by the co-executors, payment of all interest accrued or paid on the certificates of deposit and repayment of the certificates of deposit themselves, removal of the co-executors,

prohibition against the co-executors' using estate funds to pay their legal expenses, cessation of spoilation of the assets of the estate, and attorneys' fees. On September 20, 1995, Terry and Linda filed an accounting and an explanation of the accounting, as well as a list of all jointly held certificates of deposit, their amounts and interest rates.

¶17. The two-day trial took place on October 23-24, 1995. At the close of McNeil's case-in-chief, the chancellor granted McNeil's motion to amend the pleadings to conform to the proof whereby McNeil requested that the court impress a constructive trust on the nine certificates of deposit plus accrued interest or renewals of the certificates of deposit. On November 15, 1996, the chancellor issued his opinion and judgment denying all requested relief. McNeil filed a Motion to Alter or Amend Judgment, arguing that the facts are sufficient to support a finding that the certificates of deposit were received by Terry and Linda under a constructive trust, that the co-executors should be ordered to pay interest that would have been earned on the estate but for the co-executors' failure to place the funds in an interest-bearing account, and that McNeil's attorneys should be awarded fees under Mississippi's "common pool" statute. The chancellor denied this motion on December 2, 1996, stating that all matters raised by McNeil were adequately considered by the court in its previous order. McNeil filed a notice of appeal on December 26, 1996, from the opinion and judgment of the court of November 15, 1996, and the order overruling McNeil's Motion to Alter or Amend.

¶18. On June 6, 1997, McNeil filed, in the chancery court, a Motion to Correct the Record, alleging that the court reporter had omitted a response of Terry Hester upon cross-examination by McNeil's attorney. A hearing was held before the chancery court on October 31, 1997, and the chancellor denied McNeil's motion on September 8, 1997. From this order, McNeil filed an Amended Notice of Appeal on September 22, 1997.

¶19. The chancellor entered an Order Authorizing Closing of Estate and Discharge of Executors on June 23, 1997, and McNeil filed a Motion to Vacate and Set Aside the chancellor's order. In the motion, McNeil argued that the order had been obtained on an unnoticed, ex parte basis, and that because he had already filed his appeal with this Court, the chancery court was without jurisdiction to enter the order closing the estate. The chancellor denied McNeil's Motion to Vacate on November 12, 1997, and McNeil filed a notice of appeal to this Court on November 24, 1997.

¶20. The three appeals have been consolidated. McNeil raises the following issues:

**I. THE JUDGMENT OF THE CHANCELLOR WAS CONTRARY TO THE LAW AND TO THE GREATER WEIGHT OF THE EVIDENCE.**

**II. THE CHANCELLOR'S FINDING THAT THE CERTIFICATES OF DEPOSIT, INTEREST ACCRUED THEREON, AND THE RENEWAL CERTIFICATES OF DEPOSIT ARE NOT SUBJECT TO A CONSTRUCTIVE TRUST FOR THE BENEFIT OF THE DEVISEES IS CONTRARY TO THE LAW AND THE GREATER WEIGHT OF THE EVIDENCE.**

**III. THE CHANCELLOR ERRED IN FAILING TO REMOVE THE CO-EXECUTORS FOR CONFLICT OF INTEREST.**

**IV. THE CHANCELLOR ERRED BY REFUSING TO REQUIRE THE CO-EXECUTORS TO PAY INTEREST ON THE ESTATE FUNDS THAT WERE NOT HELD IN AN INTEREST-**

BEARING ACCOUNT.

**V. THE CHANCELLOR ERRED BY REFUSING TO AWARD ATTORNEYS' FEES UNDER THE "COMMON POOL" APPROACH.**

**VI. THE CHANCELLOR ERRED IN DENYING THE MOTION TO CORRECT THE RECORD.**

**VII. THE CHANCERY COURT WAS WITHOUT JURISDICTION TO CLOSE THE ESTATE.**

### STANDARD OF REVIEW

¶21. A limited standard of review is employed by this Court in reviewing decisions of a chancellor. *Reddell v. Reddell*, 696 So. 2d 287, 288 (Miss.1997) (citing *Carrow v. Carrow*, 642 So. 2d 901, 904 (Miss.1994)). The findings of a chancellor will not be disturbed on review unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard. *Bank of Mississippi v. Hollingsworth*, 609 So. 2d 422, 424 (Miss. 1992) (citing *Smith v. Dorsey*, 599 So. 2d 529 (Miss.1992); *Bowers Window & Door Co. v. Dearman*, 549 So. 2d 1309 (Miss.1989)). The standard of review employed by this Court for review of a chancellor's decision is abuse of discretion. *Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc.*, 716 So. 2d 200, 204 (Miss. 1998). However, for questions of law, the standard of review is de novo. *Consolidated Pipe & Supply Co. v. Colter*, 735 So.2d 958, 961 (Miss. 1999) (citing *Harrison County v. City of Gulfport*, 557 So. 2d 780, 784 (Miss. 1990); *Cole v. National Life Ins. Co.*, 549 So. 2d 1301, 1303 (Miss. 1989)).

### DISCUSSION OF LAW

**I. THE JUDGMENT OF THE CHANCELLOR WAS CONTRARY TO THE LAW AND TO THE GREATER WEIGHT OF THE EVIDENCE.**

¶22. In this assignment of error, McNeil argues only that the chancellor erred as a matter of law in not imposing a constructive trust on the nine certificates of deposit. Because this discussion merely duplicates the second issue discussed below, it is there considered.

**II. I. THE CHANCELLOR'S FINDING THAT THE CERTIFICATES OF DEPOSIT, INTEREST ACCRUED THEREON, AND THE RENEWAL CERTIFICATES OF DEPOSIT ARE NOT SUBJECT TO A CONSTRUCTIVE TRUST FOR THE BENEFIT OF THE DEVISEES IS CONTRARY TO THE LAW AND THE GREATER WEIGHT OF THE EVIDENCE.**

¶23. McNeil argues that because he offered clear and convincing proof of abuse of confidence on the part of the executors, the chancellor erred in refusing to impose a constructive trust on the certificates of deposit. McNeil asserts that the executors hold legal title to property which, by equity and conscience, they should not have.

¶24. A constructive trust is a fiction of equity created for the purpose of preventing unjust enrichment by one who holds legal title to property which, under principles of justice and fairness, rightfully belongs to another. *Allgood v. Allgood*, 473 So. 2d 416 (Miss. 1985); *Russell v. Douglas*, 243 Miss. 497, 138 So. 2d 730 (1962). This Court has defined a constructive trust as follows:

A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

*Saulsberry v. Saulsberry*, 223 Miss. 684, 690, 78 So. 2d 758, 760 (1955). *See also Alvarez v. Coleman*, 642 So. 2d 361, 367 (Miss. 1994); *Planters Bank & Trust Co. v. Sklar*, 555 So. 2d 1024, 1034 (Miss. 1990); *Sojourner v. Sojourner*, 247 Miss. 342, 153 So. 2d 803, 807 (1963).

¶25. Clear and convincing proof is necessary to establish a constructive trust. *Planters Bank* at 1034 (citing *Allgood v. Allgood*, *supra*; *Shumpert v. Tanner*, 332 So. 2d 411, 412 (Miss.1976)). This Court has stated that "[i]t is the [confidential] relationship plus the abuse of confidence imposed that authorizes a court of equity to construct a trust for the benefit of the party whose confidence has been abused." *Davidson v. Davidson*, 667 So. 2d 616, 620 (Miss. 1995) (quoting *Summer v. Summer*, 224 Miss. 273, 80 So. 2d 35, 37 (1955)). Fraud need not be shown. *Russell*, 243 Miss. at 505-06, 138 So.2d at 734.

¶26. It should be noted that this Court's review of a chancellor's findings of fact, including those regarding a constructive trust, is limited in that this Court cannot set aside a chancellor's findings of fact so long as they are supported by substantial credible evidence. *Davidson* at 620 (citing *Allgood*, 473 So. 2d at 421). However, this Court conducts a de novo review of questions of law, including those regarding the applicability of a constructive trust. *Davidson* at 620 (citing *Seymour v. Brunswick*, 655 So. 2d 892 (Miss. 1995); *Harrison County v. City of Gulfport*, 557 So. 2d 780, 784 (Miss. 1990)). Because the testimony offered at trial on this issue is not disputed by the parties, the sole question is whether the chancellor erred in not applying a constructive trust to the set of facts at hand. Thus, this issue is a question of law.

¶27. In order for the chancellor to have properly imposed a constructive trust, he must have found that there was a confidential relationship between Nelbert and the co-executors, plus substantial credible evidence that the co-executors abused the relationship to obtain property which they ought not, in equity and good conscience, hold and enjoy. *See Davidson* at 620. The chancellor's opinion states:

> There is no proof whatsoever before the Court that either Linda L. Hester or Terry O. Hester exercised any undue influence over Nelbert P. Hester. Quite to the contrary, the proof established that neither Linda L. Hester or Terry O. Hester had any influence or control over Nelbert P. Hester. The Court specifically finds that the allegation by movants is not supported by the proof.

> The proof does establish that one of Nelbert P. Hester's main goals after the death of Grace Hester in 1985 was to see after the invalid sister, Reba Hester, but there is not [sic] proof that he intended for any of his certificates of deposit to pass to all of his named beneficiaries in his will....

> This Court specifically finds that all of the certificates of deposit which Nelbert P. Hester had at the time of his death with Linda L. Hester or Terry O. Hester passed outside of his estate and in no way can be considered assets of his estate.

¶28. The chancellor made no finding regarding the existence of a confidential relationship between the

executors and Nelbert Hester. McNeil asserts that there was such a relationship, while the executors argue that there was not. This Court has stated that "the terms 'confidence' and 'confidential relationship' are construed liberally in favor of the confider and against the confident for purposes of raising a constructive trust."*Alvarez*, 642 So. 2d at 367 (citing *Russell*, 243 Miss. at 505, 138 So.2d 730; *Adcock v. Merchants & Mfrs. Bank of Ellisville*, 207 Miss. 448, 42 So. 2d 427 (1949)). A familial relationship is not intrinsically one of confidence. *Saulsberry v. Saulsberry*, 232 Miss. 820, 834, 100 So. 2d 593, 599 (1958). The record shows that Nelbert managed his own financial affairs until the time of his death and that the executors never advised Nelbert in any of his financial affairs and never handled any business affairs for Nelbert. Terry and Linda did not know they were joint owners of the certificates of deposit until Nelbert's death. On one occasion, Linda drove Nelbert and Hettie to their attorney's office, at which time they executed their wills, but Linda testified that she remained in the car and did not know that the two were executing wills. Also, Terry and Linda did not know they were named as co-executors of the estate until after Nelbert's death. On the other hand, the record shows that Nelbert often asked Linda, an accountant, to prepare his tax returns. Linda and Terry often performed various services for Nelbert, such as doing his yard work, driving him to the grocery store, and taking care of Nelbert when he was ill. Their names were also on the safe deposit box and signature card of Nelbert's checking account, though they testified that they never accessed the safe deposit box until after Nelbert's death and that they never wrote checks on the account until his death. Furthermore, Terry testified that, a few days before Nelbert's death, Nelbert gave him his wallet and keys and told Terry that he would have to "take care of things."

¶29. Again, the chancellor made no finding regarding the existence of a confidential relationship. His failure to do so, however, is of no consequence in light of his determination that McNeil offered no proof that the executors exercised any influence or control over Nelbert Hester or that Nelbert intended the certificates of deposit to pass to the devisees under his will. The mere existence of a confidential relationship between the parties is insufficient to warrant the imposition of a constructive trust. *Alvarez* at 368. McNeil must show there existed conduct, on the part of the executors, influential in Nelbert's having placed the certificates of deposit in the names of the executors. *Lipe v. Souther*, 224 Miss. 473, 483-84, 80 So. 2d 471, 475 (1955). McNeil must demonstrate that but for the conduct of the executors, Nelbert would not have placed their names on the certificates of deposit. *Id.*

¶30. As the chancellor states, there is absolutely no evidence in the record that either Terry or Linda was influential in causing Nelbert to place their names on the certificates of deposit. No evidence was offered to show that the certificates of deposit were made jointly payable at the suggestion or request of Terry or Linda or that they in any manner induced such. There was no evidence that Nelbert made the certificates of deposit jointly payable with any understanding, express or implied, that the co-executors would hold the certificates for the benefit of the other heirs. Neither was there any proof that Terry or Linda, by act, word or deed, expressly or impliedly, led Nelbert to believe they would hold the certificates for the benefit of the other heirs. In fact, it is undisputed that neither Terry nor Linda even knew about the certificates of deposit until after Nelbert's death. Both Terry and Linda testified that they never advised Nelbert in his financial affairs. In fact, McNeil offered testimony that Nelbert was an individual unlikely to take the advice of others when it came to his financial affairs.

¶31. McNeil contends that the proof clearly established that Nelbert intended the certificates to pass with his estate. The chancellor, however, found no evidence of Nelbert's intent that Terry and Linda hold the certificates in trust or that the certificates pass with the estate. The chancellor thus found the outcome to be controlled by this Court's decision in *Estate of Stamper v. Edwards*, 607 So. 2d 1141 (Miss. 1992).

McNeil asserts that the chancellor incorrectly applied *Stamper* and that *In re Estate of Holloway*, 515 So. 2d 1217 (Miss. 1987), superseded by statute as stated in *Cooper v. Crabb*, 587 So. 2d 236 (Miss. 1991), should control.

¶32. The issue in *Stamper* was whether certificates of deposit held by Stamper at her death belonged to the co-payees on the certificates or to Stamper's estate. Stamper died intestate in 1985. At the time of her death, she held two certificates of deposit which she had procured in 1975 and renewed in 1981. One certificate of deposit was payable to Stamper or Francis Williams, and the other was payable to Stamper or Marcus Williams. The lower court held that the certificates of deposit passed outside Stamper's estate. The question before this Court on appeal was whether Miss. Code Ann. § 81-5-63, as amended in 1988, controlled the disposition of the certificates of deposit. Applying the amended version of § 81-5-63, the lower court determined that the certificates passed outside of Stamper's estate. In 1981, when Stamper first purchased the certificates of deposit, the early version of § 81-5-63 read as follows:

> When a deposit has been made or shall hereafter be made in the name of two (2) or more persons, payable to any one (1) of such persons, or payable to any one (1) of such persons or the survivor, or payable to any one (1) of such persons or to any one (1) of the survivors, such deposit or any part thereof or interest or dividends thereon may be paid to any one (1) of the said persons, whether one or more of said persons be living or not, and the receipt of acquittance of the person so paid shall be a valid and sufficient release and discharge to the bank for any payment so made. . . .

¶33. In *Holloway*, decided in 1987, this Court held that certificates of deposit were not "deposits" within the statutory presumption of this early version of § 81-5-63. The Court held that, in the absence of express survivorship provisions, the co-payee of a certificate of deposit acquired no rights unless the "donor" satisfied the requisites of a valid and enforceable inter vivos gift. *Holloway* at 1223. The Legislature, however, reacted quickly, amending § 81-5-63 to provide for a conclusive presumption of survivorship. *Stamper* at 1148. The statute, as amended, contained the above language plus the following additional language:

> The making of a deposit in such form, or the making of additions thereto, shall create a presumption in any action or proceeding to which either the bank or any survivor is a party of the intention of all the persons named on the deposit to vest title to the deposit and the additions thereto and all interest or dividends thereon in the survivor or survivors. . . . The term "deposit" as used in this section shall include, but not be limited to, any form of deposit or account, such as a savings account, checking account, time deposit, demand deposit or certificate of deposit, whether negotiable, nonnegotiable or otherwise.

¶34. In *Stamper*, the administratrix of the estate argued that the 1988 amendments did not apply retroactively, and that because Stamper renewed the certificates of deposit in 1981, *Holloway* should control. *Stamper* at 1148. The Court rejected this argument. The Court explained that because the law says to citizens, "if you do it this way, the courts will give it this effect," the issue before the Court was what the law said to Stamper in 1981. *Id.* at 1149. The Court stated that it presumed Stamper had fair knowledge of the content of the law in 1981 when she last renewed the certificates of deposit, and asked whether enforcement of the law as clarified by the 1988 amendment would give what Stamper did in 1981 an effect she had no reason to expect. *Id.* The Court found that because there was nothing in pre-*Holloway* law to give an informed person in 1981 the notion that the term "deposit" in § 81-5-63 did not

include certificates of deposit, that Stamper reasonably believed that she had created a right of survivorship in the co-payees. The Court held that the certificates of deposit belonged to the co-payees and did not pass through the estate. *Id.* at 1150.

¶35. McNeil asserts that because the amendment to § 81-5-63 "altered a legal presumption" upon which Nelbert's attorney "undoubtedly counseled Nelbert when he finalized his estate plan in 1986," this Court's holding in *Holloway* applies. This assertion is misplaced for two reasons. First, Nelbert and Hettie began their estate planning with the creation of their wills and the procurement of certificates of deposit in 1986. *Holloway* was not decided until 1987. As this Court explained in *Stamper*, there was nothing in pre-*Holloway* law that would lead an informed person to reasonably believe that the procurement of certificates of deposit jointly payable did not create survivorship rights in a co-payee. Second, as in *Stamper*, the question before this Court is whether the law as clarified by the 1988 amendment to § 81-5-63 gives what Nelbert did in 1992, the last date on which he renewed and created the certificates of deposit, an effect he had no reason to expect. *Holloway* was applicable law from November 25, 1987, the date it was decided, until April 27, 1988, the date it was superseded by the amendment to § 81-5-63. Nelbert renewed the certificates of deposit created by Nelbert and Hettie in 1990, and continued to renew the certificates of deposit and create others until 1992. Though *Stamper* was not decided until 1992, the law with regard to the ownership rights in jointly payable certificates of deposit changed in 1988 with the clarification of and amendment to § 81-5-63, not in 1992 with the *Stamper* decision. Nelbert's intent in procuring the jointly-held certificate of deposit is to be determined as of 1992, when the last of the certificates of deposit were created and/or renewed, not 1986, when Nelbert supposedly last consulted an attorney. As the executors assert, this Court presumes that Nelbert Hester knew the law. *Pearson v. Weaver*, 252 Miss. 724, 173 So. 2d 666 (1965). This Court has stated:

> While the law recognizes that there is no method known to the law by which to make people prudent . . ., every person must be presumed to know the law, and the absence of some misrepresentation or illegal concealment of facts, the person must abide the consequences of his contracts and actions. . . . [I]n the absence of fraud, deceit, or fiduciary relations of some kind, the court cannot relieve a person from the consequences of his acts merely because he has not acted prudently or diligently. . . ."

*Id.* at 731-32, 173 So. 2d at 669.

¶36. Thus, according to § 81-5-63, as amended, the co-executors presumptively held title to the certificates of deposit. The chancellor correctly recognized the statutorily-created presumption of an intent on Nelbert's part to vest title in the co-executors. Because McNeil offered no proof that Nelbert intended otherwise, the chancellor held that legal title to the certificates of deposit was held by Terry Hester and Linda Hester. Because McNeil failed to prove by clear and convincing evidence that Terry and Linda should not hold equitable title as well, the chancellor refused McNeil's request that a constructive trust be imposed on the certificates of deposit.

¶37. McNeil also contends that, though Terry and Linda testified that Nelbert never told them what to do with the certificates of deposit, Nelbert's instructions were left in the will, and that the will makes Terry and Linda "de facto trustees" for the heirs. This argument is without support. There is simply no reference in the will to the certificates of deposit, nor was evidence presented that Terry or Linda even knew of the certificates of deposit prior to Nelbert's death. The fact that the will named Terry and Linda co-executors of the estate does not make them "de facto" trustees of the certificates of deposit for the devisees under the

will.

¶38. Additionally, McNeil argues that the actions of the co-executors demonstrate that they recognized the certificates to be part of the estate. As support for this argument, McNeil offers the evidence that Terry and Linda kept the funds from the certificates of deposit separate from their other personal funds and the evidence that they at one time intended to make a gift of the proceeds of the certificates of deposit. This argument is merely speculative and falls far short of McNeil's burden of clear and convincing evidence.

¶39. McNeil lastly argues that because the certificates of deposit were an inter vivos gift, the gift is presumed invalid, shifting the burden to the executors. McNeil cites *Madden v. Rhodes*, 626 So. 2d 608, 618 (Miss. 1993), for the proposition that where there exists a confidential relationship between the parties to a transaction, there is an automatic presumption that the conveyance of an inter vivos gift was the product of undue influence. In such a situation, the gift is presumptively invalid, and unless the presumption is rebutted by clear and convincing evidence offered by the party wishing to uphold the validity of the gift, the conveyance must fail. *Madden* at 618-19. *See also* *Cooper v. Crabb*, 587 So. 2d 236, 243 (Miss. 1991). McNeil argues that the chancellor erred in requiring McNeil to present clear and convincing evidence of a constructive trust and in not requiring the co-executors to rebut a presumption of undue influence.

¶40. McNeil's argument is misplaced. As *Madden* states, where the presumption of undue influence arises, a gift is presumed <u>invalid</u>, and unless the donee rebuts the presumption, the conveyance must <u>fail</u>. *Madden* at 618-19. This Court has applied this presumption only in cases where a party has challenged the validity of a transaction, seeking to set aside the transaction as invalid. McNeil argued before the trial court and before this Court that, though the gift to the executors is valid, a constructive trust should be imposed under principles of equity. McNeil does not argue that the gift is invalid. The presumption discussed in *Madden* does not apply where a party's only requested relief is the imposition of a constructive trust.

¶41. *Madden* involved an action in which the executor of the decedent's estate sought to <u>set aside</u> the decedent's creation of certificates of deposit payable to the decedent or Madden. This Court affirmed the chancellor's finding that a confidential relationship existed between the decedent and Madden, raising the presumption of undue influence, which Madden failed to rebut with clear and convincing evidence. *Griffin v. Armana*, 687 So. 2d 1188 (Miss. 1996), also relied upon by McNeil, involved a like analysis. In *Griffin*, the grantor of real property brought an action against his niece to recover the property. Griffin had deeded the property to his niece and placed the deed in a safe deposit box, to which the niece had a key, with the promise to leave the property to the niece upon his death. The niece took the deed from the box prior to Griffin's death and recorded the deed. In addressing Griffin's request that the deed be <u>canceled</u>, this Court held that the chancellor correctly determined that a confidential relationship existed between Griffin and his niece, and recognized the presumption of undue influence. *Id.* at 1192-94. The Court held that the chancellor erred in finding that the niece had rebutted the presumption, and the Court reversed the chancellor's decision and rendered judgment that the deed should be canceled. *Id.* at 1194. Significantly, the Court separately addressed Griffin's request that a constructive trust be imposed on pieces of jewelry belonging to Griffin but wrongfully in the niece's possession. The Court stated that it is the confidential relationship plus the abuse of the confidence imposed that authorizes the court to construct a trust. *Griffin* at 1195 (citing *Summer v. Summer*, 224 Miss. 273, 80 So. 2d 35 (1955)). The Court held that because the niece had abused the confidential relationship with Griffin, the chancellor erred in failing to impose a constructive trust concerning the jewelry. Never in the discussion of Griffin's request for a constructive trust did the Court apply the presumption of undue influence, even though the Court had clearly found a

confidential relationship between Griffin and his niece.

¶42. The presumption of undue influence has been recognized by this Court in numerous cases in which the complainant sought to <u>set aside</u> various transactions. *See, e.g.*, **Cooper v. Crabb**, 587 So. 2d 236 (Miss. 1991) (action to set aside decedent's procurement of certificates of deposit in the name of the decedent and her sister); **In re Launius**, 507 So. 2d 27 (Miss. 1987) (action to set aside decedent's will); **Norris v. Norris**, 498 So. 2d 809, 813-14 (Miss. 1986) (ex-husband brought action to set aside quitclaim deed he gave to his former wife); **Kelly v. Shoemake**, 460 So. 2d 811, 819-20 (Miss. 1984) (action to set aside various deeds, codicils, and transfers of funds); **Leggett v. Graham**, 218 So. 2d 892 (Miss. 1969) (action to cancel deeds executed by complainants' father to his other children).

¶43. Nevertheless, the presumption has never been recognized by this Court in cases in which the complainant requests, not that a transaction be set aside as invalid, but, rather, that a constructive trust be established. For instance, in **Fletcher v. Nemitz**, 186 So. 2d 232 (Miss. 1966), this Court held that there was no constructive trust in favor of Nemitz, despite her performance of an oral agreement with her mother that her mother would deed her a flower shop if Nemitz would move to Mississippi and pay off the loan on the shop. The Court stated that though there existed a confidential relationship between Nemitz and her mother, there was no evidence that the mother had abused that relationship. Never was the presumption discussed in any of the above cases applied in **Nemitz**.

¶44. Likewise, in **Davidson v. Davidson**, 667 So. 2d 616 (Miss. 1995), this Court, in addressing a mother's change of beneficiary on her life insurance policy from her husband to her son, held that, though there existed a confidential relationship between the mother and her son, there was no abuse of that confidence. Again, the Court engaged in no analysis of a presumption of undue influence.

¶45. In the case at hand, McNeil did not request that the transaction involving the certificates of deposit be set aside. He requested, both before the chancery court and before this Court on appeal, only that the court impose a constructive trust. This Court has never shifted the burden of proof to a grantee in cases where a complainant requests a constructive trust. The sole analysis engaged in by this Court has been only that required by cases such as **Davidson**, 667 So. 2d at 620; **Campbell v. Campbell**, 249 Miss. 670, 163 So. 2d 649 (1964); and **Summer v. Summer**, 224 Miss. 273, 80 So. 2d 35, 37 (1955), where the pertinent inquiry is whether there existed a confidential relationship and whether there was an abuse of that confidence, with the burden of clear and convincing evidence on the party seeking the imposition of the constructive trust.

¶46. McNeil offered no evidence of fraud, duress, abuse of confidence, or any type of unconscionable conduct, concealment or questionable means on the part of the executors. Furthermore, McNeil offered no evidence that Nelbert intended Terry and Linda to hold the certificates of deposit in trust for the other devisees under the will or for the certificates of deposit to pass with the estate. McNeil had the burden of proving the existence of a constructive trust by clear and convincing evidence. He failed to do so. The chancellor did not err in denying McNeil's request for the imposition of a constructive trust.

## III. THE CHANCELLOR ERRED IN FAILING TO REMOVE THE CO-EXECUTORS FOR CONFLICT OF INTEREST.

¶47. McNeil initially requested, in his Motion for Accounting and Other Relief, that the chancellor remove the co-executors because of their alleged failure to provide an accounting. At the close of McNeil's case-in-

chief, McNeil's attorney requested that the court amend the pleadings to reflect McNeil's request that a constructive trust be imposed. It was not until after the trial that McNeil submitted a brief requesting, among other things, that the chancellor remove the co-executors for conflict of interest. The chancellor denied the request, stating only that "[t]he Court does not find this to be well-taken and is denied." On appeal, McNeil argues that the chancellor's refusal to remove the co-executors was error.

¶48. McNeil relies on this Court's decisions in *Estate of Ratliff*, 395 So. 2d 956 (Miss. 1981), and *In re Chambers*, 458 So. 2d 691 (Miss. 1984). *Ratliff* involved a probate dispute between the decedent's heirs and the executor of the estate. The executor petitioned the chancery court for authority to sell certain real property of the decedent to satisfy expenses of the estate. Attached to the petition was the decedent's tax return, which represented that he owned a partnership interest at the time of his death. However, at trial, witnesses for the executor testified that, prior to his death, the decedent gave his partnership interest to the executor. The heirs appealed the chancellor's determination that the decedent's partnership interest was not in his estate at death. The Court held that the chancellor was manifestly wrong in finding that the decedent made an inter vivos gift of his interest in the partnership to the executor. The Court stated, "In the absence of fraud or mistake, the executor may not take, in the course of the same cause or proceeding, inconsistent positions which would be detrimental to the appellants, on the one hand, and beneficial to himself, on the other hand." *Ratliff* at 957.

¶49. As the executors note, the above statement by the *Ratliff* Court is not applicable in the case at hand. In *Ratliff*, the executor made conflicting representations to the court -- that is, for purposes of his request that he be able to sell off property of the estate, the executor maintained that the partnership interest was part of the estate, while at the same time arguing that the decedent made an inter vivos gift of the partnership interest. In the case at hand, the co-executors have made no conflicting representations to the court, having maintained at all times that the certificates of deposit do not belong to the estate. While this representation may be beneficial to the co-executors and detrimental to the other devisees, the co-executors do not maintain the "inconsistent positions" condemned by this Court in *Ratliff*.

¶50. More accurate is McNeil's reliance on *In re Chambers*, 458 So. 2d 691 (Miss. 1984). *Chambers* involved an appeal by devisees under the decedent's will of the chancery court's approval of the accounting offered by the executors. The decedent had deeded property to one of the executors, and the devisees of the estate brought suit to bring the property back into the estate. This Court stated:

> In defending this suit and attempting to prevent the subject property from being returned to the corpus of the estate, [the executor] obviously had a conflict of interest with the estate. As we have held in *Ratliff v. Ratliff*, 395 So. 2d 956 (Miss. 1981), an executor may not take inconsistent positions which would be detrimental to the heirs on the one hand and beneficial to himself on the other. When an executor finds his own interest in conflict with those of the estate, the sanctity of the fiduciary relationship is invaded and he should immediately resign as executor.

*Chambers* at 693. The Court's reliance on *Ratliff* in this situation was perhaps unfortunate given the distinction addressed above. However, whether based on *Ratliff* or not, the Court's statement, "when an executor finds his own interest in conflict with those of the estate, ... he should immediately resign as executor," clearly applies to the situation in *Chambers* as well as the case at hand. The Court in *Chambers* went on to find that the co-executors breached their duties in failing to make an accounting until thirteen years after the decedent's death. The Court also held that the fees awarded to the executors and to the

attorney for the estate were excessive. The Court reversed the chancellor's order approving the final accounting and remanded the case for a determination of appropriate fees, ordering the chancellor to take into consideration the inappropriate conduct of the executors.

¶51. The executors in the case at hand attach significance to the fact that the *Chambers* Court did not remove the executors or order the chancellor to remove the executors. The executors submit that though it might have been advisable for Terry and Linda to voluntarily resign upon the commencement of McNeil's action, this Court is not compelled by *Chambers* to reverse the finding of the trial court and order their removal. The executors contend that when the chancellor, in the case at hand, determined that the certificates of deposit were owned by Terry and Linda and that no constructive trust could be imposed, the potential for conflict was resolved, and the issue of whether Terry and Linda should have resigned pending the action brought by McNeil is rendered moot.

¶52. This Court addressed the failure of a lower court to remove an executor for conflict of interest in *In re Estate of Holloway*, 515 So. 2d 1217 (Miss. 1987), superseded by statute as stated in *Cooper v. Crabb*, 587 So. 2d 236 (Miss. 1991). In *Holloway*, the decedent's widow filed a complaint against the executor, seeking recovery of a promissory note and certificates of deposit which listed the decedent and executor as payee. The chancellor determined that the assets at issue were not part of the decedent's estate. This Court reversed the judgment of the chancellor, finding that the executor failed to demonstrate that the decedent had made a gift of the certificates of deposit. The Court also noted that the executor had a conflict of interest with the estate "which necessitated his resignation as executor." *Id.* at 1225 (citing *Chambers*, 458 So. 2d at 693; *Ratliff*, 395 So. 2d at 957). The Court held that the failure of the chancellor to appoint a new executor upon request was error, and stated that such should be done on remand. *Id.* at 1225.

¶53. In light of this Court's opinions in *Chambers* and *Holloway*, the chancellor's failure in the case at bar to remove the executors for conflict of interest was error. The fact that McNeil did not request removal of the executors for conflict of interest until after the trial is of no consequence. He requested their removal in his initial request for relief, and the conflict was obvious even at that time. The executors should have resigned, and, when they failed to do so of their own initiative, the chancellor should have granted McNeil's request that they be removed by order of the court. The conflict of interest was not rendered moot by the chancellor's determination that no constructive trust should be imposed on the certificates of deposit as McNeil timely appealed that determination.

## IV. THE CHANCELLOR ERRED BY REFUSING TO REQUIRE THE CO-EXECUTORS TO PAY INTEREST ON THE ESTATE FUNDS THAT WERE NOT HELD IN AN INTEREST-BEARING ACCOUNT.

¶54. McNeil argues that Miss. Code Ann. § 91-13-1 (1994) places upon executors a duty to invest estate funds. He submits that because the estate account established by the executors was not an interest-bearing account, the executors should be surcharged at least the statutory rate of interest on funds held in the estate account. The chancellor denied McNeil's request, but made no particularized finding on this issue.

¶55. Miss. Code Ann. § 91-13-1 (1994) provides:

> All trustees, guardians, and other fiduciaries in this state, unless prohibited by the will, deed, or trust instrument of the testator or other person establishing the trust, agency, or fiduciary relationship, or unless by any such instrument another mode of investment is prescribed, may, in addition to methods

of investment now authorized by law, invest all funds held in trust or for investment as provided in this chapter.

(emphasis added).

¶56. Miss. Code Ann. § 91-13-6 (1994) provides:

All trustees, guardians, administrators, executors and other fiduciaries <u>may</u>, without court order, if not prohibited by the instrument, judgment, decree or order establishing the fiduciary relationship, invest or deposit funds held in a fiduciary capacity in time certificates of deposit, savings accounts or other interest-bearing accounts of (a) any state or national bank (including itself, if such fiduciary be a bank) whose main office is located in the state and the deposits of which are insured by the Federal Deposit Insurance Corporation, or (b) any state or federal savings and loan association (including itself, if such fiduciary be a savings and loan association) whose main office is located in the state and the deposits of which are insured by the Federal Savings and Loan Insurance Corporation.

(emphasis added).

¶57. The executors argue that the above sections place no duty on executors to deposit estate funds in interest-bearing accounts, but merely provide that such "may" be done by the executors. As the executors note, this Court, in construing the meaning of statutes, has stated that the word "may" is generally considered permissive or discretionary as opposed to mandatory, unless a contrary legislative intent is evident. *Chandler v. City of Jackson Civil Serv. Comm'n*, 687 So. 2d 142, 145 (Miss. 1997). *See, e.g.*, *Cook v. Cook*, 725 So. 2d 205, 207 (Miss. 1998) (construing Miss. Code Ann. § 93-5-2 (Supp. 1994)); *American Sand & Gravel Co. v. Tatum*, 620 So. 2d 557 (Miss. 1993); *Godsey v. Houston*, 584 So. 2d 389, 391 (Miss. 1991) (construing 18 U.S.C.A. § 182); *Parnell v. Smith*, 309 So. 2d 853, 855 (Miss. 1975) (construing Miss. Code Ann. § 11-31-21 (1972)); *Murphy v. State*, 253 Miss. 644, 649, 178 So. 2d 692, 693 (1965) (construing Miss. Code Ann. § 1647 (1956)). The purpose of the subdivisions of Title 91, Chapter 13 is to grant authority to fiduciaries to invest funds, not to impose a duty to invest funds. Section § 91-13-9, entitled "application of chapter," refers to the "powers granted by this chapter," not the duties imposed by the chapter.

¶58. However, though there may be no "per se" duty to place funds in an interest-bearing account, Miss. Code Ann. § 91-13-3 (1994) imposes upon fiduciaries who invest funds a duty to invest funds prudently. That section states:

In acquiring, investing, reinvesting, exchanging, retaining, selling and managing property held in fiduciary capacity, the fiduciary shall exercise the judgment and care under the circumstances then prevailing which men of prudence, discretion, and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital. . . .

¶59. Thus, a fiduciary could exceed the authority granted by the chapter by managing the funds under his or her care in an imprudent manner. Nevertheless, whether the executors exercised the requisite standard of care in regards to the management of the estate funds is a question of fact. Though the chancellor made no specific finding of fact on this issue, this Court should proceed on the assumption that he resolved all such fact issues in favor of the executors. *Goode v. Village of Woodgreen Homeowners Ass'n*, 662 So. 2d

1064, 1071 (Miss. 1995) (citing *Newsom v. Newsom*, 557 So.2d 511, 514 (Miss.1990)); *PMZ Oil Co. v. Lucroy*, 449 So. 2d 201, 205 (Miss. 1984)). Furthermore, McNeil has not alleged, before the chancery court or this Court, that the executors acted imprudently under § 91-13-3. He argues only that § 91-13-1 mandates that the executors invest estate funds. As discussed above, § 91-13-1 does not impose such a duty.

## V. THE CHANCELLOR ERRED BY REFUSING TO AWARD ATTORNEY FEES UNDER THE "COMMON POOL" APPROACH.

¶60. McNeil contends that, should this Court hold that the chancellor erred in refusing to impose a constructive trust, the Court should also find that the chancellor erred in refusing to award McNeil attorneys' fees under the "common pool" approach from the interest generated by the certificates of deposit as well as from the principal of the certificates of deposit. As discussed above, the chancellor did not err in refusing to impose a constructive trust. Thus, this Court need not reach this issue.

## VI. THE CHANCELLOR ERRED IN DENYING THE APPELLANT'S MOTION TO CORRECT THE RECORD.

¶61. McNeil argues that the chancellor erred in denying his Motion to Correct the Record filed pursuant to Rule 10(e) of the Mississippi Rules of Appellate Procedure. The portion of the transcript in question, which involves the direct examination of Terry Hester by Hal H.H. McClanahan, III, McNeil's attorney, reads as follows:

Q. It's a fact, isn't it, that you were prepared to give this money in the CD's to do this with, because you knew Uncle Helbert, Uncle Nelbert wanted it to be done with his money. Isn't that right?

A. He didn't tell me what he wanted to be done with his money.

Q. You were prepared - (interrupted by Mr. Hester)

A. I guess you could say he told me. He left it joint accounts. If you want to really know. He entrusted me to have money, Linda to have the money.

Q. So he did leave it to you in trust, didn't he, Terry?

A. He. To me, not to nobody else, and Linda.

Q. In trust to you and Linda?

A. Not, not in a trust now, I'm talking about he left it for us. I didn't say in a trust.

Q. But he left it to you trusting that you and Linda would get the money to the heirs, didn't he?

A. No. I didn't say that. I'm not sure that he said that, 'cause he never did tell me.

Q. Let's go back to your deposition.

A. Okay.

Q. Page one seventy-three. The question is: Well, do you think that's what Neb intended, that it

would go to you and Linda or to your heirs? What's you, what's your answer:

A. Where is that at?

Q. Right here.

A. I think he had trust that we would do what that, we'd do whatever is right about anything.

Q. Thank you.

A. But I wasn't talking about the money right there.

Q. You weren't talking about the money?

A. I didn't answer that question on that basis.

Q. Well let's just go back a second. I'm going to start on page one seventy-two (172). Question: Well, all right, I'm curious. If you claims this money came, that came through the CD is yours and you were to die that night, would, would the heirs of Neb Hester, all of these ten people specified in the will, would they get any of the money that Neb left?

A. Would they get any of the money from?

Q. I said: Any of the three hundred and ninety thousand. What's your answer then?

A. It'd be up to Linda. She's co-owner in it.

Q. And then question I asked you: Well, do you think that's what Neb intended, that it would go to you and Linda or to your heirs? And what's your answer?

A. I think he had trusted we would do whatever is right about anything.

Q. **And we're still talking about the three hundred and ninety thousand dollars, weren't we, Terry?**

A. **(No response audible to the court reporter.)**

Mr. McClanahan: May I have one second, Your Honor?

Chancellor: All right.

Mr. McClanahan: I tender the witness, Your Honor.

(emphasis added).

¶62. McNeil argued, in his Motion to Correct the Record, that Terry Hester gave a "yes" response, and that, had the court reported indicated that she did not hear the response, his attorney would have repeated the question to get the answer on the record. The chancery court held a hearing regarding the motion, at which McClanahan, Terry Hester, and the court reporter, Shirley Wadkins, testified.

¶63. McClanahan testified that he distinctly understood Terry Hester to say "yes," and that had Terry

Hester not given a response to the question, McClanahan would have repeated the question. Terry Hester testified that he did not answer the question because Mr. McClanahan "wanted to refer to counsel" and cut off his response. Terry Hester also testified that he answered "no" to the same question in his deposition.

¶64. Shirley Wadkins testified that she recalled the testimony in question and that she heard no answer from Terry Hester. She stated that she had listened to a tape of the proceeding both prior to receiving McNeil's Motion to Correct the Record and after receiving the Motion. Wadkins testified that she listened to the tape intently several times and that she did not hear an answer on the tape. She testified that it is unlikely that Terry Hester could have given a response which she did not hear because she sits within two feet of the witness and because Terry's other responses were clear and distinctly made. She stated that the courtroom had four microphones as well as a P/A system and a microphone next to the witness. She explained that, according to her training as a court reporter, her job is to take, not make, the record, and that she can only report what she hears. She stated that the lawyer is responsible for making the record. On cross-examination, Wadkins testified that it is possible, though unlikely, that Terry Hester gave a response which she did not hear. She also stated that she was not facing the witness in the courtroom and that she could not have discerned a non-verbal answer.

¶65. The chancellor denied McNeil's motion to correct the transcript. McNeil appeals this order, arguing that the judgment is contrary to the law and the greater weight of the evidence. McNeil has failed to support this assignment of error with authority. It is the duty of an appellant to provide authority in support of an assignment of error. *Hoops v. State*, 681 So. 2d 521, 526 (Miss. 1996); *Kelly v. State*, 553 So. 2d 517, 521 (Miss. 1989); *Smith v. State*, 430 So. 2d 406, 407 (Miss. 1983); *Ramseur v. State*, 368 So. 2d 842, 844 (Miss. 1979). This Court considers assertions of error not supported by citation or authority to be abandoned. *Thibodeaux v. State*, 652 So. 2d 153, 155 (Miss. 1995). Because McNeil has failed to meet the burden of providing authority to support this assignment of error, this issue is procedurally barred. *Drennan v. State*, 695 So. 2d 581, 585-86 (Miss. 1997).

¶66. Furthermore, the chancellor's determination that the transcript should not be altered was correct. The dispute over whether Terry Hester responded to McClanahan's inquiry was a dispute of fact. This Court will not disturb a chancellor's findings of fact unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard. *Bank of Mississippi v. Hollingsworth*, 609 So. 2d 422, 424 (Miss. 1992) (citing *Smith v. Dorsey*, 599 So. 2d 529 (Miss. 1992); *Bowers Window & Door Co. v. Dearman*, 549 So. 2d 1309 (Miss.1989)). Clearly, there was substantial evidence upon which the chancellor could have based his determination that no response was given.

## VII. THE CHANCERY COURT WAS WITHOUT JURISDICTION TO CLOSE THE ESTATE.

¶67. McNeil appealed the chancellor's denial of his Motion for Accounting and Other Relief on December 26, 1996. On June 23, 1997, while the appeal was pending, the chancellor entered an order authorizing the closing of the estate and discharging the executors. On September 8, 1997, McNeil filed a Motion to Vacate and Set Aside the chancellor's order, arguing that the order is void because the chancery court no longer had jurisdiction to close the estate as McNeil had already noticed his appeal to this Court. McNeil also argued that the order was allegedly procured through the misconduct of the executors' counsel, Ms. Brown. McNeil requested that Brown be held in contempt of court and assessed with sanctions for earwigging the chancellor under Rule 3.10 of the Uniform Chancery Rules. McNeil also argued that Brown violated Rule 4.2 of the Mississippi Rules of Professional Conduct by communicating directly with McNeil,

who was represented by counsel. The chancery court held a hearing on McNeil's motion on October 31, 1997, and the chancellor subsequently denied the motion on November 7, 1997.

¶68. All parties to this appeal concede that the chancery court lacked jurisdiction to enter its order of June 23, 1997, and that the order is therefore void. This Court has held that the filing of a notice of appeal transfers jurisdiction of a matter from the lower court to this Court, and that the lower court is thus without authority to amend, modify, or reconsider its judgment. *Wright v. White*, 693 So. 2d 898, 903 (Miss. 1997) (citing *In re Estate of Moreland*, 537 So. 2d 1345, 1346-47 (Miss. 1989) (when a proper appeal is taken, the case is ipso facto removed to the appellate court)). *See also Dunavant Enterprises, Inc. v. Ford*, 294 So. 2d 788, 792 (Miss. 1974); *Crocker v. Farmers & Merchants Bank*, 293 So. 2d 444 (Miss. 1974); *Lindsey v. Lindsey*, 219 Miss. 720, 723, 69 So. 2d 844, 844-45 (1954). If the appeal is without supersedeas, as is the appeal at hand, the appellee may proceed to execute on the decree in the lower court. *Lindsey*, 219 Miss. at 723, 60 So. 2d at 844-45. The lower court may not, however, broaden, amend, modify, vacate, clarify, or rehear the decree. *Moreland* at 1346. The chancellor's order discharging the executors and closing the estate broadens its judgment of November 15, 1996. Consequently, the order entered June 23, 1997, must be vacated as null and void because it exceeds the subject matter jurisdiction of the lower court. *See Duvall v. Duvall*, 224 Miss. 546, 552, 80 So. 2d 752, 754 (1955).

¶69. McNeil also contends that counsel for the executors, Brown, should be sanctioned for professional misconduct. First, McNeil asserts that Brown violated Rule 4.2 of the Mississippi Rules of Professional Conduct by mailing directly to McNeil, who was represented by counsel, a copy of the order closing the estate and a check disbursing McNeil's share of the estate proceeds. Second, McNeil argues that Brown violated Rule 3.10 of the Uniform Chancery Court Rules by securing the order closing the estate without notice to McNeil.

¶70. McNeil presented these arguments to the chancellor at the hearing on McNeil's Motion to Vacate and Set Aside the order closing the estate. The chancellor found that "after full consideration of the matter including the record in this cause, the testimony of witnesses and exhibits received at the hearing," the relief requested should be denied. McNeil's request for sanctions against Brown are likewise denied by this Court. The chancellor's order closing the estate is void, as is his denial of McNeil's Motion to Vacate and Set Aside that order. There is thus no denial of relief from which to appeal to this Court. The proper forum for an ethics complaint against Brown is specified in Rule 8 of the Mississippi Rules of Discipline. If McNeil receives an unfavorable disposition, he may then appeal to this Court pursuant to Rule 9 of the Rules of Discipline.

## CONCLUSION

¶71. The chancellor's denial of McNeil's Motion to Alter or Amend the court's judgment of November 15, 1996, is affirmed in part and reversed in part. The chancellor's denial of McNeil's requests for the imposition of a constructive trust and for interest on estate funds not held in an interest-bearing account is affirmed. The chancellor's denial of McNeil's request that the executors be removed for conflict of interest was error and is reversed. The case is remanded to the chancery court with instructions to appoint an executor with no interest in the matter.

¶72. The chancellor's denial of McNeil's Motion to Correct the Record is affirmed. The chancellor's Order Authorizing the Closing of the Estate and Discharging the Executors is vacated as null and void, and this

case is remanded for further proceedings consistent with this opinion.

¶73. **AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; AND REMANDED.**

**SULLIVAN AND PITTMAN, P.JJ., BANKS, MILLS, WALLER AND COBB, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY. PRATHER, C.J., NOT PARTICIPATING.**