ISHEE, J.,
for the Court:
¶ 1. Following a trial beginning on August 22, 2006, the Chancery Court of Washington County entered judgment in favor of Cooper Gilder, Inc. (Cooper Gilder). The chancery court found that Robert D. Cooper (Robin),[1] Donald Dunaway (Don), and Connie Burford (Connie) (collectively, the Appellants) were jointly and severally liable in the amount of $1,346,748. Aggrieved by the judgment, Robin, Don, and Connie allege the following points of error:
I. Whether the two cases were erroneously consolidated.
II. Whether the chancellor applied the correct standard of proof.
III. Whether the factual findings were supported by the record.
IV. Whether the chancellor applied the correct standard, in refusing to reconsider findings on the issue of whether Robin’s acquisition of the Cooper Gilder lease prior to his termination, in light of the additional evidence submitted on that motion.
V. Whether the chancellor erred in applying constructive trust law.
*266 VI. Whether the award was properly-related to a correct application of the law and evidence.
¶2.-⅛ a consolidated matter, the chancery court granted a directed verdict in favor of Robin, Marilyn Dunaway (Marilyn), and Mildred Watson (Mildred), thereby dismissing with prejudice the claim of Winnie Gilder (Winnie) and Cooper Gilder. In the consolidated case, the chancery court found that all life insurance proceeds paid on the life of James Gilder were to remain the property of John Cooper’s siblings — Robin, Marilyn, and Mildred. On cross-appeal, Winnie asserts that this ruling was in error. She claims that the more than $650,000 in insurance proceeds should have been paid to her.
¶ 3. Finding no reversible error with the chancery court’s rulings, we affirm the judgment on direct and cross-appeal.
FACTS AND PROCEDURAL HISTORY
¶ 4. John Cooper (John) and James Gilder (James) were close friends. In 1974, John and James started a business that later became known as Cooper Gilder.[2] Each of them owned one-half of the stock in Cooper Gilder. The company’s operation was twofold: it would clean barges, and it would then reclaim the collected waste and sell it to other companies. The business was located in Greenville, Mississippi, and some of its operations were conducted on a river front on a strip of land known as Island 84. Cooper Gilder did not own Island 84; it was owned by John and James, individually. To gain access to Island 84, the corporation negotiated with Mississippi Power & Light — later Enter-gy — to lease an easement over the strip of land leading to Island 84.
¶ 5. In December 2001, John and James renewed a buy/sell agreement (BSA), which was funded through life insurance policies from New York Life.[3] The policies were for $650,000 each — $1,300,000 total— and were taken out on the lives of John and James. John owned two policies on the life of James, which totaled $650,000, and James owned two policies on the life of John, which had been reduced by loans to a total of $595,000. The purpose of the BSA was to allow the surviving stockholder to collect the insurance proceeds in the event of the other stockholder’s death and to use those proceeds to purchase the shares owned by the deceased stockholder. By this time, both parties were in poor health. James had been diagnosed with chronic obstruction pulmonary disease, which necessitated that he carry an oxygen tank with him, and John had recently been diagnosed with cancer. John was the first stockholder to die. Following his death, John’s estate included his fifty-percent share of stock in Cooper Gilder, and James, as the beneficiary on John’s life insurance received the proceeds from the policy. According to the terms of BSA, James then paid John’s estate $650,000— $595,000 from insurance and a $55,000 promissory note — to purchase John’s shares in Cooper Gilder. The transaction was memorialized in an agreement dated December 17, 2003. Following this transaction, James became Cooper Gilder’s sole shareholder.
¶ 6. Upon James’s death on February 8, 2004, John’s siblings received the proceeds from the life insurance policy on James. *267 Unbeknownst to James’s wife, Winnie, Robin, as executor of John’s estate, had transferred the policy from John’s estate to John’s siblings — Robin, Marilyn, and Mildred. Winnie later claimed that this was in error and that James had intended to transfer the policy from John’s estate to himself. This was the basis of the suit filed by Winnie against John’s siblings, in. which she sought reimbursement for the life insurance proceeds from the policy on James’s life.[4] Winnie argued that Cooper Gilder, which was then wholly owned by James, continued to pay the policy premiums until James’s death. Furthermore, Winnie offered the testimony of Michael Garrett, of New York Life Insurance, who prepared the insurance policies for John and James. He said that the transfer of ownership of the policy to John’s siblings was done without his assistance, but it was something a client would normally consult him to carry out.
¶ 7. After hearing arguments from the parties and reviewing the BSA and the insurance policies, the chancellor found that the BSA was clear on its face and that John’s siblings were the proper recipients of the insurance proceeds. The chancellor granted a directed verdict on the issue and dismissed two of the defendants who were not necessary for the remaining proceedings — Marilyn and Mildred. Robin remained on as a defendant in the business interference claim, along with Don and Connie. The chancellor refused to grant a directed verdict on that matter, and the defense presented its evidence.
¶ 8. On July 23, 2003, prior to John’s death, he and James executed several deeds to partition the lands that they jointly owned. John received full ownership of Island 84, and James received full ownership of twelve acres of land near the Cooper Gilder office building. John then deeded Island 84 to himself and Robin, and James deeded the twelve acres to himself and Winnie.
¶ 9. Following James’s death, Winnie, as his wife, inherited his stock and was left as the sole stockholder in Cooper Gilder. Having no experience in the business, Winnie placed Connie and Robin in positions of power, and she relied entirely on them to operate Cooper Gilder. Under Winnie’s ownership of Cooper Gilder, Connie was made an officer and a director; she also kept the company’s books. Connie had been employed at Cooper Gilder full time since 1983. Robin was John’s brother and was the executor of John’s estate. He had been employed with Cooper Gilder full time since 1977 and part time prior to 1977. Robin was in charge of determining what chemicals came in and what to do with them, and he also managed the yard. Robin testified that, following Winnie’s acquisition of Cooper Gilder, “Connie formed a sort of [triumvirate] in which Don, herself, and I took over the duties and made joint decisions on anything of import.” Don was married to Marilyn, who was Robin’s sister. By 2005, Don had worked for Cooper Gilder for a period of ten years along with a prior four-year period. Following the deaths of John and James, Don and Robin were the only remaining licensed tankermen employed by Cooper Gilder. Don testified that the United States Coast Guard required that a licensed tankerman be present at all times while chemicals were being stripped from a barge.
¶ 10. Immediately after James’s death, Connie, Robin, and Don sent a letter to Cooper Gilder’s customers to reassure them that, despite the founders’ deaths, *268 Cooper Gilder would continue operating as usual. Winnie’s name was not included on the letter, and she claimed that she never knew about that letter until after the Appellants left Cooper Gilder. Before James’s death, he had suggested to Winnie that she sell the business to Robin. However, when Winnie approached Robin about purchasing Cooper Gilder, he told her to keep the business for a couple years to make sure she wanted to sell it. According to Winnie, James had also talked to Ted Graves, owner of Arcadeo Chemicals (Arcadeo), about finding a buyer for Cooper Gilder. Arcadeo was in the business of brokering chemicals to companies such as Cooper Gilder, and Winnie said that Graves knew many of the people connected with Cooper Gilder’s business. Winnie placed Robin in charge of entertaining potential buyers. One company, Cone Solvents (Cone), came to inspect the Cooper Gilder business, and Robin showed them around the facilities. Another company, Superior Solvents (Superior), also expressed interest in purchasing Cooper Gilder. However, Winnie testified that Robin never informed her of Superior’s interest, nor did he tell her that Superior had sent representatives to inspect the facilities. After speaking with Robin, neither company decided to purchase Cooper Gilder, and the company remained under Winnie’s control.
¶ 11. Following Robin’s acquisition of Island 84, Connie encouraged him to contact Entergy and have it put the access lease in his name. Upon Connie’s suggestion, Robin sent a letter to Entergy, which was dated January 4, 2005. In the letter, Robin notified Entergy that he had acquired ownership of Island 84, and he enclosed a check for the amount usually paid by Cooper Gilder to Entergy for the easement lease. Eventually, the negotiations turned to the possibility of Robin purchasing the leased strip of land used to access Island 84 instead of leasing it. At trial, Winnie claimed that Robin had put the lease in his name without notifying her, but there was no evidence that it was ever placed in Robin’s name. Robin testified that negotiations to purchase the land were interrupted by Hurricane Katrina. However, he said that he had acquired permission to use the land. Following the trial, Entergy informed Cooper Gilder that its lease was about to expire, and Winnie made the lease payment to preserve Cooper Gilder’s interest.
¶ 12. According to Winnie, she became concerned about the Appellants’ plans after she learned about Robin’s letter to Entergy. On February 21, 2005, Winnie scheduled a meeting of the Cooper Gilder employees. Early that morning, Winnie’s brother, William “Bill” Roncali, who she had hired as Operations Vice President the week before, terminated Robin for insubordination during a conversation about signing a non-compete agreement. Winnie claimed that Robin then spoke with the remaining employees prior to the scheduled meeting. Don admitted that there was a congregation of employees outside the gate that morning, but he said it was because Bill had changed the locks, which prevented them from getting to work. At the meeting, Winnie and Bill presented the remaining employees with a non-compete agreement. The agreement began, “For good consideration and as an inducement for Cooper Gilder Inc. to continue employment .... ” When asked by Don if there was any need to be in the meeting if they were not going to sign the agreement, Bill responded, “I guess not.” Both Winnie and Bill claimed that the issue was open for negotiation, but the other employees did not give them the opportunity to discuss the proposed agreement. Immediately after the non-compete agreement was brought up, all of the employees who were *269 present except for Winnie, Bill, Winnie’s son, and Raymond Gentry walked out of the meeting. Bill and Winnie also said that they did not fire them; everyone just left. Bill also testified that Gentry, who was not present but was traveling at the time of the meeting, had planned on staying with the company, but the other truck drivers convinced him to leave.
¶ 13. Winnie claimed that the employees who left took with them their contact lists from Cooper Gilder, but those employees denied that they took any lists or any company information. By March 4, 2005, less than a month after the meeting, Robin, Chuck, and Don had incorporated Warfield Point Associates, Inc. (Warfield). The company conducted the same type of business as Cooper Gilder, and it employed the prior Cooper Gilder employees. War-field even used Cooper Gilder’s fax line, which had been listed under the name Charlie Chemicals, which was owned and operated by Robin. Warfield’s business was not exactly the same as Cooper Gilder’s. Warfield could not get some of the more lucrative contracts that Cooper Gilder once had, and it relied more heavily on brokering chemicals than Cooper Gilder once did. Winnie testified that Warfield had sales of $785,592 in 2005, and Warfield already had sales of $628,621.89 through May 31, 2006.
¶ 14. Following the Appellants’ departure and starting of Warfield, Winnie testified that Cooper Gilder’s business was drastically reduced. Winnie made the last deposit in March 2006, and she claimed that Cooper Gilder had earned only $37,255.13 in income at that point for 2006. She also claimed that Cooper Gilder was left with approximately $90,000 in liabilities for prior chemical spills. Contrasted to prior years, Cooper Gilder had sales of approximately $776,000 in 2005 and more than $2,500,000 in 2004.
¶ 15. The chancellor concluded that Winnie had failed to show any misappropriation of trade secrets, methods of operation, or vendors’ lists in the employees’ actions in leaving Cooper Gilder and setting up Warfield. Nevertheless, the chancellor found that the employees were in a position of trust with the inexperienced Winnie at the helm of Cooper Gilder; therefore, a fiduciary relationship existed — something to which the chancellor noted that they even admitted. As a result of their actions, Cooper Gilder went from earning more than $1,000,000 per year to earning less than $40,000 in 2006. In the meantime, Warfield had already grossed $700,000 for 2006 at the time of trial. According to the chancellor, the purchasing of the Entergy lease, coupled with the secrecy and the en masse walkout — which also included an employee who was not at the meeting — indicated a breach of the fiduciary responsibility that existed between key employees and Winnie. Therefore, the chancellor awarded Winnie and Cooper Gilder $1,346,740 in actual damages, which represented Cooper Gilder’s average yearly gross profit from 2000 to 2005 and the approximate value of the business as contemplated by the BSA. The chancellor refused to award punitive damages or attorney’s fees.
STANDARD OF REVIEW
¶ 16. This Court gives deference to the findings of a chancellor and will not disturb those findings unless they are manifestly wrong, unsupported by credible evidence, or were the result of the application of an erroneous legal standard. Keener Props., L.L.C. v. Wilson, 912 So.2d 954, 956(¶ 3) (Miss.2005). However, this Court will review questions of law under a de novo standard. Id.
DISCUSSION
I. Whether the two cases were erroneously consolidated.
*270 ¶ 17. The Appellants first argue that the chancellor erred in consolidating the BSA/insurance proceeds case and the business tort/unjust enrichment case. They argue that there should not have been any overlap in the issues or facts in the two cases. While the witnesses would have been the same, the Appellants claim that the witnesses would have been testifying about different times and events. The Appellants contend that testimony concerning the BSA and about who John and James intended to ultimately own the company bled over into the business tort/unjust enrichment case where it was irrelevant.
¶ 18. Rule 42(a) of the Mississippi Rules of Civil Procedure provides:
When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.
The decision of whether to consolidate cases “is within the sound discretion of the trial court.” Smith v. H.C. Bailey Cos., 477 So.2d 224, 231 (Miss.1985) (quoting Vicksburg Chemical Co. v. Thornell, 355 So.2d 299, 300 (Miss.1978)); see also Fielder v. Magnolia Beverage Co., 757 So.2d 925, 938(¶ 52) (Miss.1999) (applying a liberal consolidation standard).
¶ 19. Following the trial, the chancellor again addressed the issue of consolidation and noted that she was correct in consolidating the cases because the facts were intertwined and because it was “necessary in order to determine the accurate and legal obligations of the parties.” Testimony from key witnesses that was relevant to both suits included the nature and value of the business, the ownership and relevance of Island 84, and the relationships among Winnie and the various Appellants. We find no abuse of the chancellor’s discretion in consolidating the two cases case. This issue is without merit.
II. Whether the chancellor applied the correct standard of proof.
¶ 20. The Appellants’ sole contention on this issue is that the chancellor did not apply the correct standard of proof in imposing a constructive trust. Similarly, the Appellants argue in Issue V that the chancellor erred in imposing a constructing trust. Therefore, we will not address this issue here. It will be addressed in Issue V, which addresses the Appellants’ constructive trust claim.
III. Whether the chancellor’s factual findings were supported by the record.
¶21. Next, the Appellants point to a number of findings that they claim are contrary to the evidence. Those findings were the following: (1) pursuant to the BSA, Winnie obtained ownership of Cooper Gilder while the Appellants received $1,300,000; (2) James conveyed ownership of Island 84 to John for $1,300,000; (3) the Appellants were secretive and changed their routine concerning the insurance policy; and (4) Robin purchased the Island 84 access lease from Entergy. The Appellants argue that each of these findings by the chancellor was contrary to the evidence in the record.

A. BSA

¶ 22. First, the Appellants argue that the chancellor’s finding that they acquired $1,300,000 in insurance proceeds and that Winnie acquired the Cooper Gilder business was not supported by the evidence. The Appellants point out that the insurance proceeds were not worth $1,300,000 because James had taken a $55,000 loan against his share. They also point out that the BSA terminated prior to Winnie inher *271 iting Cooper Gilder; therefore, she could not have inherited the company “pursuant to” the BSA.
¶ 23. The Appellants are correct on both of these points; however, these slight errors in the chancellor’s findings do not affect the outcome of the case. The insurance proceeds were not worth $1,300,000. Actually, James paid $595,000 from the insurance proceeds and another $55,000 in the form of a promissory note to purchase John’s shares in Cooper Gilder. Combined with the insurance proceeds that John’s siblings received upon James’s death, the total, nevertheless, came to $1,300,000.
¶ 24. Also, the BSA did not provide that Winnie would take over Cooper Gilder following James’s death. However, James purchased John’s shares in the business, as was provided for in the BSA, and Winnie later inherited the business following James’s death. While Winnie did not receive control of Cooper Gilder as a direct result of the terms of the BSA, she gained control of the business as a result of her husband’s purchase of the stock pursuant to the BSA and from the transfer of the stock to her following James’s death.
¶25. Ultimately, the chancellor’s findings correctly summarized what actually took place regarding the BSA. Correcting either or both of these inaccuracies in the chancellor’s bench opinion would not alter the judgment.

B. Deal to Convey Island 84 for $1,300,000

¶ 26. Next, the Appellants argue that there was no evidence of any deal in which James received $1,300,000 in exchange for John receiving sole ownership of Island 84. The Appellants seem to take issue with the chancellor’s finding that “[a]pparently, James Gilder and John Cooper had made a deal in which John Cooper received ownership of the property on which the business was conducted and James Gilder received One Point Three Million Dollars.” We agree that there was no evidence that an exchange such as that described by the chancellor ever took place. However, there was mention in the record of a deal granting John sole ownership of Island 84 in exchange for James receiving land near the company’s headquarters. Following the exchange of property, John conveyed ownership of Island 84 to himself and Robin with rights of survivorship.
¶ 27. There was testimony that John’s and James’s ultimate intent was that John, whose family operated Cooper Gilder, receive the business along with Island 84 and that James receive the $1,300,000 value of the business. As such, we are not convinced that this statement was an error by the chancellor rather than a reference to this deal. Furthermore, even if this statement was erroneous, we do not find that it had any bearing on the judgment. The chancellor awarded Winnie $1,346,000, which represented the approximate value of Cooper Gilder. The judgment does not reflect that the chancellor thought there was another $1,300,000 transaction that took place.

C. The Appellants’ Secrecy and Change of Routine Concerning the Insurance Policy

¶ 28. Next, the Appellants argue that there was no evidence of any change in their routine concerning the insurance policy nor any secrecy surrounding it. The chancellor noted that the handling of the access lease; the walkout at the February 21, 2005, meeting by all of the employees; and “what appears to be secrecy and a change of routine concerning the handling of the Gilder insurance policy ...,” all contributed to her finding of an abuse of confidence by the Appellants.
*272 ¶ 29. Contrary to the Appellants’ claims, the testimony from Garrett, the New York Life insurance agent who handled the life insurance policies, revealed that there was some secrecy and change of routine involved in the transfer of life insurance beneficiaries. Garrett said that he had written the policies for John and James, and he had continued to keep in touch with them. Following John’s death, Garrett sent a letter addressed to James with instructions on how to change the beneficiary of the policy on James’s life. Garrett testified that when John’s siblings decided to transfer the policy from John’s estate to them as beneficiaries, they did not involve Garrett. John’s siblings did not seek his assistance in transferring the policy to them. According to Winnie, she thought that she would be named as the beneficiary, and she was never informed that the policy was transferred to John’s siblings.
¶ 30. Ultimately, the chancellor did not find that John’s siblings engaged in any wrongdoing concerning the insurance policy, merely that they did not fully disclose to Winnie what actions they took in transferring the policy. There was testimony supporting this finding; therefore, we find no error with it.

D. Robin’s Interest in the Island 81 Access Lease

¶ 31. The last finding of fact that the Appellants take issue with is the chancellor’s finding that Robin purchased the rights to the land used to access Island 84. Robin, admittedly, did not acquire rights to the access lease to Island 84. He testified at trial that he did not acquire the lease or purchase the property. However, he said that he paid Entergy for the lease, and he said that he had permission to use the lease. Nevertheless, as of October 2006, after the trial, the lease was still paid for by Cooper Gilder.[5]
¶ 32. While Robin did not actually acquire the lease, he did attempt to acquire the rights to the access lease either by renegotiating the lease in his name or purchasing the leased land. Whether Robin actually acquired the lease is, ultimately, irrelevant to the chancellor’s determination that the Appellants breached their fiduciary duty to Winnie. Under the chancellor’s rationale, the fact that Robin attempted to gain control of the lease was sufficient to show that the Appellants went behind Winnie’s back to further their own interests over those of Winnie, to whom they owed a duty. Furthermore, the testimony from Robin was that he acquired permission to use the land to access Island 84, so he had some interest in the property-
¶ 33. The chancellor had the opportunity to consider this issue in the Appellants’ motion for reconsideration. The Appellants presented evidence that Robin never actually acquired ownership of the access lease, but the chancellor did not see the need to alter her findings of fact. It was clear that Robin did not acquire title to the property, nor did he lease the property from Entergy. However, he sent a check to Entergy to acquire the lease, and he testified that Entergy never returned the check. He also began negotiations to purchase the property, and he had permission to use the property to access Island 84. Therefore, while he did not acquire the lease or the title, his actions concerning the property, nevertheless, supported the chancellor’s judgment.
*273 IY. Whether the chancellor applied the correct standard, in refusing to reconsider findings on the issue of whether Robin’s acquisition of the Cooper Gilder lease prior to his termination, in light of the additional evidence submitted on that motion.
¶ 34. Following the entry of the chancellor’s judgment, the Appellants filed a motion asking the chancellor for a new trial, to alter or amend the judgment, for a judgment notwithstanding the verdict, for reconsideration, and to reopen the record to admit additional proof and newly discovered evidence. The Appellants now claim that the chancellor erred in finding that they presented no newly discovered evidence and in denying their motion.
¶ 35. A trial court should treat a motion for reconsideration as a post-trial motion under Mississippi Rule of Evidence 59(e). Brooks v. Roberts, 882 So.2d 229, 233(¶ 15) (Miss.2004) (citing Boyles v. Schlumberger Tech. Corp., 792 So.2d 262, 265(¶ 6) (Miss.2001)). On appeal, this Court will review the denial of such a motion under an abuse of discretion standard. Id. (citing Bang v. Pittman, 749 So.2d 47, 52(¶ 28) (Miss.1999) (overruled on other grounds)).
¶ 36. In denying the Appellants’ motion to reconsider, the chancellor found that the evidence that the Appellants sought to admit was not newly discovered and that it could have been discovered in time for trial. We agree with this finding. The additional deeds that the Appellants sought to introduce reflected the transfer of Island 84 to John and then to John and Robin with rights of survivorship. Nevertheless, this evidence was covered in the trial testimony. The affidavits that the Appellants presented were from Robin. They indicated that Robin never gained rights to the access lease nor ownership of the underlying property. However, as the Appellants point out in their brief, this was sufficiently covered in Robin’s testimony at trial. Attached to one of the affidavits was a letter from Entergy, which informed Robin that Entergy could not lease the property to him. The letter was from 2005, and, as such, it was not new evidence. The chancellor was correct in finding that it should have been introduced at trial.
¶ 37. As for evidence that Cooper Gilder paid for the lease in October 2006, we do not find that this should have affected the chancellor’s judgment.
V. Whether the chancellor erred in applying constructive trust law.
¶ 38. The Appellants cite a number of alleged errors with the chancellor’s finding of a constructive trust. First, they point out that Cooper Gilder had no legal or equitable right to continue to use Island 84. Second, they claim that they had a right to set up a competing business whether or not Winnie knew about such preparations and regardless of when they began making preparations. Third, the Appellants argue that Winnie did not prove the necessary elements of a constructive trust by clear and convincing evidence.
¶ 39. The supreme court has defined a constructive trust as follows: *274 Davidson v. Davidson, 667 So.2d 616, 620 (Miss.1995) (quoting Saulsberry v. Saulsberry, 223 Miss. 684, 690, 78 So.2d 758, 760 (1955)). This Court has previously noted that “a constructive trust is a means recognized in our law where one who unfairly holds a property interest may be compelled to convey that interest to another to whom it justly belongs.” Thornhill v. Thornhill, 905 So.2d 747, 753(¶ 18) (Miss.Ct.App.2004) (quoting In re Estate of Horrigan, 757 So.2d 165, 170(¶ 25) (Miss.1999)).
*273 A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.
*274 ¶ 40. The burden of proving a constructive trust rests on the party seeking to have the constructive trust imposed. McNeil v. Hester, 753 So.2d 1057, 1069-70(¶ 45) (Miss.2000). The party seeking a constructive trust must prove by clear and convincing evidence that there existed a confidential relationship and that there was an abuse of that confidence. Id.
¶ 41. In Sojourner v. Sojourner, 247 Miss. 342, 354, 153 So.2d 803, 807 (1963), the supreme court noted that:
While a confidential or fiduciary relationship does not in itself give rise to a constructive trust, an abuse of confidence rendering the acquisition or retention of property by one person unconscionable against another suffices generally to ground equitable relief in the form of the declaration and enforcement of a constructive trust, and the courts are careful not to limit the rule or the scope of its application by a narrow definition of fiduciary or confidential relationships protected by it.
(Citation omitted).
¶ 42. First, we find no merit to the Appellants’ claim that the chancellor did riot apply the correct burden of proof. Contrary to their claim, the chancellor found that the facts “clearly and convincingly show[ed] an abuse of that confidence on the part of the defendants.”
¶ 43. Additionally, the chancellor was fully apprised of the law regarding the imposition of a constructive trust. In the chancellor’s bench opinion, she cited a number of cases that set forth the law on constructive trusts, and she referenced the legal standard that the Appellants presently cite to this Court. According to the Appellants, Cooper Gilder did not meet its burden of proving that they unjustly possessed a property interest that belongs to Cooper Gilder. As such, the Appellants claim that the chancellor’s imposition of a constructive trust was contrary to those authorities. They argue that the imposition of a constructive trust was not proper because, contrary to the chancellor’s finding, Robin did not actually hold title to the property which was used to access Island 84.
¶ 44. Whether Robin acquired rights to the access lease is irrelevant. The chancellor found an abuse of confidence based on the Appellants’ actions, and it was that abuse of confidence that allowed the Appellants to unconscionably acquire property — Cooper Gilder’s clients and business. In Cooper Gilder’s complaint, it was requested that a constructive trust be imposed on any income obtained from its former customers.[6] Therefore, it was the value of the business that the Appellants gained through their abuse of confidence that was the basis for the constructive trust, not the interest in the access lease.
¶ 45. The chancellor went on to find that, at a time when Winnie was almost *275 fully dependent on the employees to act in her and Cooper Gilder’s best interests, they all walked out of a company meeting without any negotiations, thereby ending their employment. Within days of their departure, those same employees had set up a competing company that performed much of the same business as Cooper Gilder and worked with many of its same clients. Furthermore, unbeknownst to Winnie, Robin had begun negotiating with Entergy to take over the rights to the property that was the only means of accessing Island 84 — an integral part of Cooper Gilder’s operations.
¶ 46. All along, the Appellants testified that John’s and James’s intent was that one of their families receive $1,800,000 representing the value of the business and that the other family would receive the actual business and Island 84. Having no desire to run Cooper Gilder, Winnie even attempted to sell it to Robin, who refused her offer. Seemingly, this would have been ideal because it would have left the Appellants in control of Cooper Gilder and Island 84, and Winnie would have received the value of the business. As it turned out, John’s siblings collected approximately $1,300,000 from James’s purchase of John’s stock and from the life insurance proceeds from the policy on James. Also, after a year of working with Winnie, they essentially ended up with Cooper Gilder, albeit under the name Warfield.
¶ 47. The dissent argues that the corporate-opportunity doctrine applies to the present case and that Cooper Gilder did not prove the existence of a fiduciary relationship. However, there was no mention of the corporate-opportunity doctrine in the underlying case, and we see no reason why the chancellor should have addressed it. The corporate-opportunity doctrine contemplates a situation in which an officer or director breached his fiduciary duty to the corporation by usurping a business opportunity, of which the officer became aware and of which the corporation was financially able to take advantage. Hill v. Se. Floor Covering Co., 596 So.2d 874, 877 (Miss.1992). Such is not the situation in the present case. The Appellants did not become aware of a business opportunity that they failed to communicate to Cooper Gilder. Instead, at a time when Winnie was wholly dependent on the Appellants to operate the business she inherited, they walked out on Cooper Gilder, taking Cooper Gilder’s clients with them and almost immediately started a new company that performed the same work for those clients. Accordingly, we do not agree that this was a case in which the chancellor should have applied the corporate-opportunity doctrine.
¶ 48. The dissent would also find that the chancellor erred in finding that the Appellants owed Winnie any fiduciary duty because the at-will employees failed to constitute officers or directors. In light of the evidence and the fact that the Appellants even admitted at trial that they were in a fiduciary relationship with Winnie, we disagree. The supreme court has discussed the idea of a fiduciary duty as follows:
It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal. (If a relation of trust and confidence exists between the parties— that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused — that is suffi *276 cient as a predicate for relief. The origin of the confidence is immaterial.).
Roman Catholic Diocese of Jackson v. Morrison, 905 So.2d 1213, 1239(¶ 82) (Miss.2005) (quoting Glenn v. Macon, 249 Miss. 493, 514, 163 So.2d 239, 249 (1964)).
¶ 49. We find that the facts in the present case supported the chancellor’s finding of a confidential relationship. First, Connie was an officer and director of Cooper Gilder. She did not hold that position when the company was under John’s and James’s control. However, James told Winnie to trust Connie to run the business, and when Winnie became the sole stockholder, she listened to James’s advice and elevated Connie to the role of an officer and director. It was Connie who encouraged Robin to negotiate with Entergy to have the access lease put in his name. Next, Robin is the brother of one of the former owners, held title to Island 84 on which Cooper Gilder performed its barge cleaning, and had worked at Cooper Gilder since the 1970s. Robin was not an officer or director, but testimony indicated Winnie relied on him, along with Connie, to run Cooper Gilder. When attempting to sell Cooper Gilder, Winnie relied on Robin to show the business to potential buyers. Even Cooper Gilder’s fax line was under the name of a company owned by Robin, and the line was later used as War-field’s fax line. Unlike Connie and Robin, Don was not placed in a position of trust by Winnie, but as a key employee, Connie and Robin brought him into the group. As Robin testified, in operating Cooper Gilder, the three of them were responsible for “decisions of anything of import.”
¶ 50. After Robin refused to purchase Cooper Gilder from Winnie, she placed her whole trust and confidence in the Appellants to operate on her behalf a business with which she had no experience. Based upon the circumstances in the present case, we find that the chancellor’s determination that a fiduciary relationship existed between the Appellants and Winnie was supported by the evidence.
¶ 51. Based on the foregoing, we find that the chancellor applied the correct burden of proof, and we also find that she correctly applied the law in her decision to impose a constructive trust. This issue is without merit.
VI. Whether the award was properly related to a correct application of the law and evidence.
¶ 52. Last, the Appellants claim that the award of $1,300,000 was not proper in relation to the injuries—Robin’s alleged acquisition of the Island 84 access lease. They again point out that Robin did not acquire the lease nor the title to the property. We have already addressed Robin’s interest in the access lease in a number of the Appellants’ previous issues.
¶ 53. The chancellor based the $1,300,000 award on the value of Cooper Gilder, as testified to by multiple witnesses. Furthermore, Robin’s actions concerning the access lease were only a part of the chancellor’s rationale in making the award. Additionally, the chancellor considered the Appellants’ actions in showing the business to potential buyers, including Robin’s failure to relay the existence of a potential buyer to Winnie. The chancellor was also concerned with the fact that all of the employees of Cooper Gilder walked out en masse without discussion, and they almost immediately set up their own, very similar business. All of this took place at a time when Robin and Connie held positions of confidence with Winnie, positions in which she placed them because of her-complete lack of experience with Cooper Gilder’s business.
¶ 54. The award of $1,300,000 represented the value of Cooper Gilder, of *277 which it was completely deprived when the Appellants abruptly walked out on Cooper Gilder and set up their own competing business. This was an award fashioned by the chancellor to do equity. “Courts of equity have all remedial powers necessary to the particular case, except those that are expressly forbidden by law.” Hall v. Wood, 443 So.2d 834, 843 (Miss.1983). In Hall, the supreme court stated that:
The remedial powers of bur chancellors are sufficient to vindicate the claims and interests of all litigants. Those powers are as broad as equity and justice require. Those powers have always been marked by flexibility and expansiveness so that appropriate remedies may be decreed to satisfy the needs of the particular case. The chancellor’s remedial powers are marked by plasticity. Equity jurisdiction permits innovation that justice may be done. That there is no precedent for the precise relief sought is of no consequence.
Id. at 842-43 (internal citation omitted). In the present case, the Appellants’ position was that the purpose of the BSA was to allow one partner’s heirs to receive the business while the other partner’s heir received the value of the business. This intent was violated when Robin and John’s other heirs received the insurance proceeds, and then Robin and Connie, upon whom Winnie was entirely dependent to run the company, breached their fiduciary relationship with Winnie by: (1) attempting to renegotiate the access lease, (2) failing to communicate the existence of a potential buyer to Winnie, (3) walking out en masse with all of the other employees, and (4) immediately creating a competing company that employed Cooper Gilder’s employees and did Cooper Gilder’s business with Cooper Gilder’s former clients. What was previously a very profitable company, with a value of approximately $1,300,000 then became worthless after the Appellants abandoned it.
¶ 55. Ultimately, this was a complicated case, and legitimate arguments were made in favor of both the Appellants and Cooper Gilder. Based on the evidence presented, we do not find that it was an abuse of the chancellor’s discretion in fashioning an award in the amount of the former value of Cooper Gilder. Therefore, this issue is without merit.
VII. Whether the chancellor erred in granting a directed verdict on the issue of the life insurance policy.
¶ 56. On cross-appeal, Winnie asserts that the chancellor erred in granting a directed verdict against her on the issue of the insurance policy on James’s life. This Court reviews a trial court’s grant of a directed verdict under a de novo standard. White v. Stewman, 932 So.2d 27, 32(¶ 10) (Miss.2006). A motion for a judgment as a matter of law tests the sufficiency of the evidence and asks “whether the evidence, as applied to the elements of a party’s case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.” Id. at (¶ 11).
¶ 57. The provision of the BSA at issue is section 7.4, which provides the following:
If any Stockholder shall cease to be a Stockholder during his lifetime or if this Agreement terminates before the death of a Stockholder, then such Stockholder shall have the right to purchase any life insurance policy which insures his life and is owned by the Owner.... A Stockholder’s right to purchase a life insurance policy shall lapse if not exercised within 30 days after the expiration of the option or termination of this Agreement.
*278 Section 16.1 of the BSA further provides for three possible terminating events:
(a) The written agreement of all of the Parties;
(b) The dissolution, bankruptcy or insolvency of the Corporation; or
(c) The death or adjudication as incompetent or insane of all Stockholders within a period of 90 days.
¶ 58. These provisions are not ambiguous. They do not provide a surviving stockholder the option of purchasing the policy on his own life — as claimed by Winnie. Section 7.4 allows a stockholder to purchase the policy on his life in two instances: (1) if a stockholder ceased to be a stockholder during his lifetime, or (2) if the BSA terminated before either stockholder died. Neither of these instances came to pass, and the BSA was carried out as its terms specified. The chancellor found no merit to Winnie’s claim that John’s siblings improperly collected life insurance proceeds that should have been hers. We find no error with that ruling.
¶ 59. THE JUDGMENT OF THE CHANCERY COURT OF WASHINGTON COUNTY IS AFFIRMED ON DIRECT AND CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANTS/CROSS-APPELLEES AND THE APPELLEES/CROSS-AP-PELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., AND IRVING, J., CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, BARNES, ROBERTS AND MAXWELL, JJ.

. Additionally, there was a Robert S. Cooper who was employed by Cooper Gilder, and he was known as Chuck. He was a second cousin of Robin.

. The business was initially called Waste Chemical Disposal, Inc.

. John and James transferred their life insurance business to New York Life in 1990. Before then, they already had a buy/sell agreement that was funded with other life insurance policies.

. The chancellor consolidated Winnie’s suit seeking recovery of the insurance proceeds with Cooper Gilder's suit for interference with its business.

. At a hearing on the Appellants’ motion for a new trial, the Appellants pointed out that, in October 2006, Cooper Gilder paid for the lease after Entergy sent a letter informing it that the lease was about to expire.

. The complaint also requested that any income obtained through the use of its trade secrets be held in constructive trust. However, the chancellor refused to find a misappropriation of trade secrets by the Appellants; therefore, such request is irrelevant to the present analysis.