# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00387-COA

**DELORIS JACKSON**                                                                    **APPELLANT**

v.

**GLENDORA MILLS**                                                                      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/19/2014 |
| TRIAL JUDGE: | HON. JANACE H. GOREE |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | J.M. RITCHEY |
| ATTORNEY FOR APPELLEE: | WESLEY THOMAS EVANS |
| NATURE OF THE CASE: | CIVIL - OTHER |
| TRIAL COURT DISPOSITION: | ORDERED THE APPELLEE TO PAY THE APPELLANT HALF THE FUNDS IN THE DECEDENT'S JOINT ACCOUNT AT THE TIME OF THE DECEDENT'S DEATH BUT DENIED ALL THE APPELLANT'S OTHER REQUESTED RELIEF |
| DISPOSITION: | AFFIRMED - 01/12/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., CARLTON AND FAIR, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1.     On February 13, 2009, Deloris Jackson filed a complaint in Madison County Chancery Court against Glendora Mills individually and in her capacity as the executor of Elease Harris's estate.   Jackson asserted that Mills had exerted undue influence on Harris to appropriate Harris's property and money for her own personal use and benefit.   Jackson further claimed that Mills breached her fiduciary duty to Harris by mismanaging Harris's assets and property and by improperly administering Harris's estate.

¶2. Jackson's complaint requested that the chancellor provide the following relief: (1) establish and enforce a constructive trust in Jackson's favor as to two certificates of deposit (CDs); (2) find that Jackson was entitled to half of the principal of a $50,000 CD, along with all the accrued interest; (3) find that Jackson was entitled to all the principal and the accrued interest on a $47,000 CD; (4) find that Jackson was entitled to half of the funds in a joint account at the time of Harris's death; and (5) remove Mills as the executor of Harris's estate.

¶3. At the hearing on Jackson's complaint, Jackson and Mills were the only two witnesses to testify. After considering the parties' evidence and testimony, the chancellor granted Jackson relief on only one issue. The chancellor found that Mills converted the balance of the funds in Harris's joint account for her personal use, and the chancellor therefore ordered Mills to pay Jackson her half of the balance remaining in the joint account at the time of Harris's death.

¶4. Aggrieved by the chancellor's judgment, Jackson appeals to this Court and raises the following issues: (1) the chancellor erred by finding that Jackson did not seek to set aside the general power of attorney Harris executed and the gifts Mills made to herself under the power of attorney; (2) the chancellor erred by failing to apply a presumption of invalidity to Mills's gifts to herself and to require Mills to overcome the presumption by clear and convincing evidence; (3) the chancellor erred by relying on dicta from *McNeil v. Hester*, 753 So. 2d 1057 (Miss. 2000); (4) the chancellor erred by failing to establish and impose constructive trusts in Jackson's favor as to the financial gifts Mills received while acting as

2

Harris's attorney-in-fact; (5) the chancellor erred by finding that Harris authorized the withdrawals Mills made for her own personal benefit and for the transfer of money to two CDs; (6) the chancellor erred by finding that Mills's conduct failed to breach her fiduciary duty to Harris; and (7) the chancellor erred by finding an ademption occurred as to the devise made to Jackson by Harris's will.

¶5.     Upon review, we find the record reflects substantial credible evidence to support the chancellor's findings.  *Id.* at 1064 (¶26).  We therefore affirm the chancellor's judgment.

## FACTS

¶6.     Harris was born in 1906, and she died in 2006 at age 100.  Following Harris's death and the probate of her will, Jackson filed a complaint against Mills in chancery court. Jackson alleged that Mills abused her power as Harris's attorney-in-fact and misappropriated Harris's property for her own personal benefit.  As a result of these alleged wrongful acts, Jackson sought several types of relief from the chancellor.

¶7.     At the hearing on her complaint, Jackson testified that she was Harris's second cousin and that Harris had known Jackson all Jackson's life.  Along with her husband and three sons, Jackson moved into a mobile home on Harris's property in 1974 and began paying Harris rent.  Jackson testified that she and Harris visited each other on a regular basis after the family moved onto Harris's property.  Even after Harris moved from her home to a care facility, Jackson testified that she continued to visit Harris on a regular basis.

¶8.     Mills also testified that she was Harris's second cousin.  However, Mills did not meet

3

Harris until a family member introduced them around 1986. At the time of the introduction, Harris was about eighty years old. After their initial meeting, Mills began to visit Harris on a regular basis. In fact, Mills stated that she drove to Harris's home at least once a week to visit Harris. Over the course of their relationship, Harris and Mills became good friends, and Mills even came to regard Harris as a mother-like figure.

¶9.     Both Jackson and Mills agreed that Harris's health began to decline around 2000. As a result, Harris hired full-time sitters to provide at-home care. Mills also testified that she began to visit Harris more frequently and would stay with Harris on the weekends. Mills further testified that she began to cook and clean for Harris, drive Harris to her doctors' appointments, supervise Harris's doctors' visits and medical treatments, administer Harris's medication, and manage Harris's financial affairs.

¶10.    Prior to her death in 2006, Harris opened a joint checking account at Trustmark National Bank. Harris named herself and Jackson as the account's joint owners with the right of survivorship. On November 21, 2000, Harris and Jackson signed a change-of-account form to authorize the addition of Mills's name to the joint account. Neither Mills nor Jackson ever deposited any personal funds into the joint account. However, acting in her capacity as Harris's attorney-in-fact, Mills regularly withdrew funds from the joint account to pay for Harris's expenses. In addition, Mills made a number of withdrawals to pay for her own personal expenses and for expenses incurred by several of her relatives, including her son and daughter. Mills testified, though, that she always made these personal withdrawals

4

with Harris's knowledge and consent.

¶11. In 2003, due to Harris's continued health decline and the expense of maintaining full-time sitters, Mills moved Harris to the Myles Retreat Center in Tougaloo, Mississippi. According to Jackson's testimony, between 2000 and 2006, Harris's physical health continued to decline, and her mental health worsened. Jackson stated that, on the bad days, Harris often stared into space and had trouble carrying on a conversation or comprehending the questions Jackson asked her. By contrast, although Mills admitted that Harris's physical strength continued to decline, she denied that Harris's mental health had also begun to deteriorate while Harris lived at the Myles Retreat Center.

¶12. On August 25, 2003, while hospitalized at Baptist Hospital, Harris executed a general durable power of attorney. The document designated Mills as Harris's attorney-in-fact and authorized Mills to perform a broad range of acts on Harris's behalf. Mills testified the power of attorney was prepared after hospital staff suggested that Harris needed a person who could sign medical-treatment forms on her behalf. Harris had spent the night in the emergency room, and at one point, her doctors thought she might not survive. The following morning Mills encountered an attorney in the hospital lobby. Mills stated that she had never previously met the attorney but that he was standing in the hospital lobby asking whether anyone required legal services. Mills asked the attorney to accompany her to Harris's room to discuss preparing a power of attorney. Even though Mills admitted that Harris was in poor physical condition and on medication at the time she discussed the power of attorney with

the attorney, Mills insisted that Harris was still mentally alert.

¶13.    On September 14, 2003, Mills signed a deed on Harris's behalf, which conveyed a fifty-nine-acre tract of Harris's land (Tract III) to Percy Nichols for $140,000. As the record reflects, Harris's will devised Tract III to Mills as the residual beneficiary of her estate. Mills testified that Harris negotiated the sale of Tract III herself but then asked Mills to attend the closing and sign the deed on Harris's behalf as her attorney-in-fact.

¶14.    Two months later, on November 28, 2003, Mills withdrew $50,000 from Harris's joint account and purchased a CD. The CD was titled jointly in the names of Harris, Mills, and Mills's daughter, with the right of survivorship. Although Harris was not present when the transaction occurred, Mills testified that Harris instructed Mills, as her attorney-in-fact, to complete the transaction and place the three names on the CD.

¶15.    On February 14, 2006, Mills, again acting in her capacity as Harris's attorney-in-fact, signed another deed to authorize the sale of Harris's residence and the surrounding 2.3 acres of land (Tract II). Nichols, who purchased Tract III in 2003, also purchased Tract II for $47,000. Under Harris's will, her residence, along with the property on which it sat, was to be left to Jackson. As with the earlier real-estate transaction, Mills testified that she had no part in the negotiations to sell the land because Harris made the arrangements herself. Following the sale of Tract II, Mills testified that Harris instructed her to use the sale proceeds to purchase another CD worth $47,000. As with the prior CD, Mills jointly titled this second CD in the names of Harris, Mills, and Mills's daughter, with the right of

6

survivorship.

¶16.    On April 26, 2006, just over two months after the sale of Tract II and the purchase of the second CD, Harris died at the age of 100. The bank statements for Harris's joint account indicated that the account contained $26,071.46 at the time of her death. Mills admitted during cross-examination that she never paid Jackson her half of the funds in the joint account. Instead, Mills admitted that, after paying Harris's funeral expenses totaling $6,556.39, she closed the joint account and spent the remaining funds for her personal use.

¶17.    Following Harris's death, the chancery court admitted her last will and testament to probate. The will, which Harris had executed in 1997, designated Mills the executor of her estate and waived any requirement for Mills to file an accounting of her actions as executor. Harris's will also directed the following three bequests and devises:  (1) Isadore Brown Sr. was to receive a one-acre tract of Harris's land (Tract I); (2) Jackson was to receive Harris's residence, situated on about one acre of land (Tract II), and all the residence's furniture, furnishings, and fixtures, with the exception of all the personal property and furnishings in the residence's front bedroom, which Harris left to Mills; and (3) Mills was to receive the residue of Harris's estate, including an approximately fifty-nine-acre tract of land (Tract III). As the record reflects, Mills, acting as Harris's attorney-in-fact, sold two of the tracts mentioned in Harris's will prior to Harris's death. In 2003, Nichols purchased Tract III, which the will devised to Mills, and in 2006, he purchased Tract II, which the will devised to Jackson.

7

¶18. In February 2009, Jackson filed her complaint against Mills and requested that the chancellor grant the following relief: (1) establish and enforce a constructive trust as to the $50,000 Mills withdrew from the joint account and invested in a CD and hold that Jackson was entitled to one-half of the $50,000, together with all accrued interest; (2) find that the sale of Tract II failed to cause an ademption of the land devised to Jackson in Harris's will, establish and enforce a constructive trust as to the $47,000 in sale proceeds that Mills transferred to a CD, and hold that Jackson was entitled to the entire $47,000, plus all accrued interest; (3) find that Mills owed Jackson half of the funds remaining in the joint account at the time of Harris's death; and (4) determine that Mills possessed a conflict of interest and failed to properly administer Harris's estate and, as a result, remove Mills as the executor of Harris's estate.

¶19. In her final judgment, the chancellor found that a confidential relationship existed between Mills and Harris at the time Harris executed her general power of attorney. Because Mills and Jackson served as the only witnesses at the hearing and provided self-serving testimony, the chancellor stated that she must "look at the surrounding circumstances [of the transactions] to determine if Mills abused her relationship with . . . Harris."

¶20. The chancellor first considered the sale of Tract III and whether a constructive trust should be imposed as to the $50,000 in sale proceeds transferred to the CD. In 2003, Mills sold Tract III for $140,000. As previously stated, Tract III encompassed a fifty-nine-acre tract of land that Harris's will devised to Mills. The chancellor found that Jackson never

asked the chancellor to set aside the conveyance, nor did Jackson claim that the transaction involved an abuse of Mills's confidential relationship with Harris. The chancellor therefore found that no abuse of a confidential relationship occurred as to the conveyance of Tract III.

¶21. The chancellor found, however, that Jackson challenged Mills's transfer of $50,000 of the sale proceeds to the CD titled in Mills's name, her daughter's name, and Harris's name. Jackson argued that Harris intended for Jackson and Mills to equally share all the cash and liquid assets Harris owned at the time of her death. Jackson further asserted that Mills circumvented Harris's intent when she transferred the $50,000 to the CD.

¶22. After considering the evidence and testimony, the chancellor found Jackson's allegations of abuse as to the $50,000 CD lacked merit. Although Harris's will devised Tract III to Mills, Tract III was the first property sold when Harris needed more money for her care. The chancellor found that the sale resulted in an ademption of the property devised to Mills by Harris's will and "primarily disinherited Mills at the expense of caring for [Harris's] needs[.]" The chancellor further found that Harris never intended Jackson to derive any benefit from Tract III and that Mills never removed the proceeds from the sale of Tract III beyond Harris's reach. Thus, the chancellor concluded that no abuse of a confidential relationship occurred, and she declined to impose a constructive trust as to the $50,000 in sale proceeds transferred to the CD.

¶23. The chancellor next considered Jackson's assertion that Mills abused her confidential relationship with Harris by spending about $17,581.25 from the joint account for the benefit

9

of herself and others. The chancellor found that the $17,581.25 constituted a portion of the sale proceeds from Tract III. The chancellor noted Mills's uncontroverted testimony that the expenditures were made with Harris's knowledge and consent. The chancellor also stated that, but for the fact that Harris needed the sale proceeds for her living expenses, Mills would have received Tract III under Harris's will. Based on her findings, the chancellor concluded that Mills's personal withdrawals, which amounted to $17,581.25, failed to constitute an abuse of her confidential relationship with Harris.

¶24. The chancellor next considered whether a constructive trust should be imposed in Jackson's favor over the $47,000 Mills transferred into a second CD titled in the names of Harris, Mills, and Mills's daughter. As previously stated, Harris received the $47,000 after selling Tract II. Because Harris's will devised Tract II to Jackson, the chancellor also considered whether the sale of the land caused an ademption of the devise to Jackson.

¶25. According to Mills, Harris herself arranged to sell Tract II, along with the residence, and Mills simply followed Harris's instructions. The chancellor found that the residence remained vacant for about three years prior to the sale of Tract II. During those three years, Mills paid for the home's upkeep from Harris's joint account. The chancellor found that, by the time Harris sold Tract II, a substantial portion of the proceeds from the earlier sale of Tract III had already been spent. In addition, the chancellor found that neither Harris nor Mills had any way to know how much longer Harris would live and require financial support. As a result of these findings, the chancellor concluded that no abuse of a confidential

10

relationship resulted from the sale of Tract II and the transfer of the proceeds to the CD.

¶26. The chancellor next considered whether the sale of Tract II caused an ademption of the devise made to Jackson by Harris's will. Although Nichols purchased Tract II during Harris's lifetime, Jackson contended that no ademption occurred because Mills, rather than Harris, disposed of the property. Jackson further argued that the disposition of the land was not an intentional act by Harris and instead contradicted her testamentary intent. Despite Jackson's claims, the chancellor found that Mills, acting as Harris's attorney-in-fact and with Harris's knowledge and consent, sold Tract II to Nichols. Because the conveyance occurred during Harris's lifetime, Tract II no longer remained in Harris's possession at the time of her death. As a result, the chancellor concluded that an ademption occurred as to the devise made to Jackson in Harris's will. The chancellor also concluded that Jackson was not entitled to any of the principal and accrued interest from the $47,000 CD.

¶27. The chancellor next considered Jackson's claim that Mills owed her half of the funds remaining in the joint account at the time of Harris's death. The chancellor found that neither Mills nor Jackson possessed any ownership interest in the joint account while Harris lived. Thus, any funds—such as the proceeds from the sale of Tracts II and III—that were transferred from the account prior to Harris's death, were not subject to the right of survivorship. At the time of Harris's death, however, the joint account contained $26,071.46. Mills then withdrew $6,556.39 to pay Harris's funeral expenses, leaving an account balance of $19,515.07. The chancellor found that Jackson was entitled to half of the $19,515.07 and

11

that Mills had converted the funds for her personal use. The chancellor therefore ordered Mills to pay Jackson $9,757.54 as her half of the funds from the joint account.

¶28. On the final issue of whether Mills should be removed as the executor of Harris's estate, the chancellor found that Jackson failed to prove that Mills improperly administered the estate or possessed a conflict of interest. The chancellor thus concluded that the issue lacked merit, and she denied the requested relief.

¶29. Aggrieved by the chancellor's judgment, Jackson now appeals to this Court.

## STANDARD OF REVIEW

¶30. This Court employs a limited standard of review when reviewing a chancellor's decisions. *McNeil*, 753 So. 2d at 1063 (¶21). "[O]ur standard of review of findings of fact, including those regarding a constructive trust, is limited in that we must not set aside a chancellor's findings of fact so long as they are supported by substantial credible evidence." *Davidson v. Davidson*, 667 So. 2d 616, 620 (Miss. 1995) (citation omitted). We only disturb the chancellor's findings if they are manifestly wrong or clearly erroneous or if the chancellor applied an incorrect legal standard. *Ainsworth v. Ainsworth*, 139 So. 3d 761, 762 (¶3) (Miss. Ct. App. 2014). However, we review a chancellor's conclusions of law de novo. *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009). "Whether a constructive trust exists is a question of law, which [the appellate court] reviews de novo." *Barriffe v. Estate of Nelson*, 153 So. 3d 613, 618 (¶26) (Miss. 2014).

## DISCUSSION

**I.** **Whether the chancellor erred by finding that Jackson did not seek to set aside the general power of attorney Harris executed and the gifts Mills made to herself under the power of attorney.**

**II.** **Whether the chancellor erred by failing to apply a presumption of invalidity to Mills's gifts to herself and to require Mills to overcome the presumption by clear and convincing evidence.**

**III.** **Whether the chancellor erred by relying on dicta from *McNeil*, 753 So. 2d at 1057.**

**IV.** **Whether the chancellor erred by failing to establish and impose constructive trusts in Jackson's favor as to the financial gifts Mills received while acting as Harris's attorney-in-fact.**

**V.** **Whether the chancellor erred by finding that Harris authorized the withdrawals Mills made for her own personal benefit and for the transfer of money to two CDs.**

**VI.** **Whether the chancellor erred by finding that Mills's conduct failed to breach her fiduciary duty to Harris.**

¶31. Jackson raises seven assignments of error. Because we find that Jackson's first six assignments of error are integrally related, we address these issues together.

¶32. As the record reflects, Mills withdrew a total of $17,581.25 from Harris's joint account for her own personal use. In addition, while acting as Harris's attorney-in-fact, Mills transferred proceeds from the sale of Tracts II and III to two CDs titled in the names of Harris, Mills, and Mills's daughter. On appeal, Jackson asserts various claims of abuse related to these disputed transactions and the chancellor's rulings on the validity of the transactions.

¶33. Specifically, Jackson contends: (1) the chancellor erred by finding that Jackson did

13

not seek to set aside Harris's power of attorney and the inter vivos gifts Mills made to herself under the power of attorney; (2) the chancellor erred by failing to apply a presumption of invalidity to the inter vivos gifts Mills made to herself; (3) the chancellor erred by relying on dicta from the Mississippi Supreme Court's holding in *McNeil* to find that the presumption of invalidity fails to apply to inter vivos gifts when a party's only requested relief is a constructive trust; (4) the chancellor erred by failing to impose a constructive trust over the $17,581.25 Mills withdrew for her own benefit and the sale proceeds Mills transferred to the two CDs; (5) the chancellor erred by finding that Harris authorized Mills's withdrawal of joint-account funds for these purposes; and (6) the chancellor erred by finding that Mills's conduct failed to breach her fiduciary duty to Harris.

¶34.    In addressing Jackson's allegations against Mills, the chancellor stated in her final judgment that "Jackson is not seeking to have [Harris's] power of attorney set aside, nor is she seeking to have the conveyances that were made pursuant to the power of attorney set aside." The chancellor found that Jackson's allegations of abuse pertained to Mills's use of the proceeds from the sale of Tracts II and III and that Jackson did not seek to set aside the real-estate conveyances. Instead, the chancellor determined that the only relief Jackson requested was the imposition of a constructive trust in her favor over the sale proceeds.

¶35.    On appeal, Jackson agrees with the chancellor's finding that she never sought to set aside the conveyances of Harris's real property but instead sought a constructive trust as to the sale proceeds derived from the real-estate transactions. Jackson contends, though, that

14

the chancellor erroneously concluded Jackson's complaint never sought to set aside Harris's power of attorney and the gifts Mills received or made for her own benefit under the power of attorney.

¶36.    Despite Jackson's claims to the contrary, the record contains substantial credible evidence to support the chancellor's finding that Jackson failed to attack the validity of Harris's power of attorney and instead sought only to impose constructive trusts as to the gifts Mills received while acting as Harris's attorney-in-fact.    The record reflects that Jackson's complaint clearly sought the relief of a constructive trust and that the evidence presented was consistent with that requested relief.  Because we find no abuse of discretion with regard to this finding by the chancellor, we turn to an analysis of Jackson's remaining claims.  *See Davidson*, 667 So. 2d at 620.

¶37.    As previously stated, Jackson argues that the chancellor erred by failing to impose constructive trusts in her favor over the inter vivos gifts Mills received or made for her benefit, including the $17,581.25 Mills withdrew from Harris's joint account and the sale proceeds Mills transferred to the two CDs.  In *McNeil*, the supreme court defined constructive trust as follows:

> A constructive trust is a fiction of equity created for the purpose of preventing unjust enrichment by one who holds legal title to property which, under principles of justice and fairness, rightfully belongs to another.  This Court has defined a constructive trust as follows:
>
> > A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of

> unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.

*McNeil*, 753 So. 2d at 1064 (¶24) (internal citations omitted).

¶38. "The burden of proving a constructive trust rests on the party seeking to have the constructive trust imposed." *Cooper v. Gilder*, 156 So. 3d 262, 274 (¶40) (Miss. Ct. App. 2009) (citing *McNeil*, 753 So. 2d at 1069-70 (¶45)). "The party seeking a constructive trust must prove by clear and convincing evidence that there existed a confidential relationship and that there was an abuse of that confidence." *Id.* "While a confidential or fiduciary relationship does not in itself give rise to a constructive trust, an abuse of confidence rendering the acquisition or retention of property by one person unconscionable against another suffices[.]" *Allred v. Fairchild*, 785 So. 2d 1064, 1068 (¶9) (Miss. 2001) (citation omitted).

¶39. Neither Jackson nor Mills disputes the chancellor's finding of a confidential relationship.[1] Instead Jackson asserts that, because a confidential relationship existed

---

[1] Our caselaw establishes that the following factors should be considered to determine whether a confidential relationship exists:

> (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.

16

between Harris and Mills, Mississippi precedent presumes the inter vivos gifts Mills made to herself were invalid as the product of undue influence. Jackson also asserts that the chancellor erred by finding that the numerous gifts Mills made to herself from Harris's property failed to breach the fiduciary duty Mills owed to Harris.

¶40.    According to Jackson, a presumption of undue influence and invalidity attached to the inter vivos gifts, and the chancellor erred by failing to require Mills to rebut this presumption by clear and convincing evidence. Jackson contends the chancellor erroneously relied on dicta from the supreme court's holding in *McNeil* to find that the presumption of invalidity fails to arise for inter vivos gifts when a party's only requested relief is a constructive trust. Jackson asserts that all such statements by the *McNeil* court constituted dicta rather than binding precedent. As the record reflects, the chancellor found the presumption of invalidity inapplicable because Jackson failed to attack the transactions themselves.

¶41.    In attacking the sufficiency of the evidence supporting the chancellor's findings, Jackson argues that Mills offered nothing other than her own self-serving testimony to show

---

*In re Estate of Dabney*, 740 So. 2d 915, 919 (¶12) (Miss. 1999) (citations omitted). The record here contains clear and convincing evidence to support the chancellor's finding that a confidential relationship existed between Harris and Mills. The record reflects that Harris and Mills met when Harris was eighty and that the two maintained a very close relationship until Harris's death at 100 years old. During the hearing, Mills testified that, as Harris's health declined, Harris increasingly relied on Mills's assistance. Mills testified that she took care of Harris by cooking and cleaning for Harris, driving Harris to her doctors' appointments, supervising Harris's doctors' visits and medical treatments, administering Harris's medication, and managing Harris's financial affairs. In addition, Harris added Mills's name to her joint account and executed a power of attorney appointing Mills as her attorney-in-fact.

17

that Harris authorized each of the disputed transactions. Jackson contends Mills's testimony failed to satisfy Mills's burden of proof, and Jackson asserts that the chancellor erred by finding Harris authorized Mills's transactions. In summary, Jackson claims that Mills's actions were unauthorized and that Mills breached her fiduciary duty to Harris. Jackson also argues that the chancellor erred by failing to impose constructive trusts in her favor.

¶42. In considering whether to impose a constructive trust in Jackson's favor, the record reflects that the chancellor stated the following:

> According to *McNeil*, the [supreme court] stated that it had applied this presumption [of invalidity to an inter vivos gift] only in cases where a party has challenged the validity of a transaction and is seeking to set aside the transaction as invalid. The [supreme] [c]ourt further stated that it has never shifted the burden of proof to a grantee in cases where a complainant requests a constructive trust. The presumption discussed in *Madden* [*v. Rhodes*, 626 So. 2d 608, 618 (Miss. 1993),] does not apply where a party's only requested relief is the imposition of a constructive trust. In the case at bar, Jackson is not seeking to have the transactions set aside. She is only seeking the imposition of a constructive trust[.] [T]herefore, the [c]ourt is not required to shift the burden to [Mills].

¶43. In *McNeil*, the complainant argued that the presumption of invalidity applied to several CDs, and he requested that the chancellor impose a constructive trust as to the CDs. *McNeil*, 753 So. 2d at 1068 (¶¶39-40). The supreme court addressed the complainant's argument as follows:

> McNeil lastly argues that because the [CDs] were an inter vivos gift, the gift is presumed invalid, shifting the burden to the executors. McNeil cites *Madden v. Rhodes*, 626 So. 2d 608, 618 (Miss. 1993), for the proposition that where there exists a confidential relationship between the parties to a transaction, there is an automatic presumption that the conveyance of an inter vivos gift was the product of undue influence. In such a situation, the gift is

18

presumptively invalid, and unless the presumption is rebutted by clear and convincing evidence offered by the party wishing to uphold the validity of the gift, the conveyance must fail. *Madden*[, 626 So. 2d] at 618-19. *See also Cooper v. Crabb*, 587 So. 2d 236, 243 (Miss. 1991). McNeil argues that the chancellor erred in requiring McNeil to present clear and convincing evidence of a constructive trust and in not requiring the co-executors to rebut a presumption of undue influence.

McNeil's argument is misplaced. As *Madden* states, where the presumption of undue influence arises, a gift is presumed invalid, and unless the donee rebuts the presumption, the conveyance must fail. *Madden*[, 626 So. 2d] at 618-19. *This Court has applied this presumption only in cases where a party has challenged the validity of a transaction, seeking to set aside the transaction as invalid. McNeil argued before the trial court and before this Court that, though the gift to the executors is valid, a constructive trust should be imposed under principles of equity. McNeil does not argue that the gift is invalid. The presumption discussed in Madden does not apply where a party's only requested relief is the imposition of a constructive trust.*

*McNeil*, 753 So. 2d at 1068 (¶¶39-40) (emphasis added).

¶44.    As previously discussed, Jackson raised no dispute as to the validity of the sale of Harris's land, and she never asked the chancellor to set aside the real-estate conveyances. Instead, Jackson requested that the chancellor uphold the conveyances and impose a constructive trust as to the sale proceeds transferred to the CDs. While *McNeil* states that "[t]he presumption discussed in *Madden* does not apply where a party's only requested relief is the imposition of a constructive trust," Jackson insists that the chancellor erred by not treating this language as dicta and by not applying a presumption of invalidity to Mills's transfer of the land-sale proceeds to the CDs that included Mills's name on the titles. *See McNeil*, 753 So. 2d at 1068 (¶¶39-40). Jackson also contends that the chancellor erred by not applying a presumption of invalidity to the withdrawals Mills made totaling $17,581.25,

19

which Jackson alleges also constituted improper inter vivos gifts.

¶45. Despite Jackson's assertions, we find the supreme court's language from *McNeil* controls as to the issues raised in this case. As the *McNeil* court explained, the presumption of invalidity applies when a party challenges the validity of a transaction itself. *Id.* at (¶40). However, the presumption fails to apply where a party only requests that the chancellor impose a constructive trust. *Id.* In the present case, the record contains substantial credible evidence to show that Jackson's only requested relief was that a constructive trust be imposed in her favor.

¶46. In analyzing whether Jackson satisfied her burden of proof to show that constructive trusts should be imposed as a matter of law, the chancellor considered whether Mills abused her confidential relationship with Harris by obtaining property that she ought not, in equity and good conscience, hold and enjoy. *See id.* at 1064 (¶¶24-25). In discussing this issue, the chancellor noted that Jackson and Mills were the only two witnesses to testify at the hearing. Having only the parties' self-serving testimony from which to draw her findings, the chancellor considered the circumstances surrounding the disputed transactions to determine Harris's intent and whether Mills abused her confidential relationship with Harris.

¶47. As our caselaw acknowledges, "a chancellor, being the only one to hear the testimony of witnesses and observe their demeanor, is in the best position to judge their credibility." *In re Estate of Carter*, 912 So. 2d 138, 143 (¶18) (Miss. 2005). "Moreover, since the chancellor is best able to determine the credibility of the witnesses' testimony, it is not [the

appellate court's] province to undermine the chancellor's authority by replacing the chancellor's judgment with our own." *Id.*

¶48. After considering the evidence and the parties' testimony, the chancellor found that Mills made each disputed transaction with Harris's knowledge and consent. Furthermore, the chancellor found no evidence that Mills abused her confidential relationship with Harris or that Mills breached her fiduciary duty to Harris. As a result, the chancellor refused to grant Jackson's requested relief and, in so doing, refused to establish constructive trusts over the disputed property.

¶49. With regard to Tract III of Harris's land, the chancellor found that Harris never intended for Jackson to derive any benefit from Tract III. Instead, the chancellor found that Harris intended for Mills alone to benefit from Tract III. As stated in her will, Harris devised Tract III to Mills, her residual beneficiary. However, the continued cost of her healthcare and maintenance forced Harris to sell Tract III. According to Mills's testimony, though, Harris negotiated the sale of Tract III herself and then instructed Mills to transfer $50,000 of the proceeds to a CD titled in the names of Harris, Mills, and Mills's daughter.

¶50. The chancellor concluded that the transfer of the $50,000 from the sale of Tract III to the CD gave effect to Harris's intentions. The chancellor found the transfer allowed Harris to retain access to the funds while still allowing Mills to receive the benefit of the sale proceeds after Harris's death. Therefore, the chancellor concluded that no abuse of a confidential relationship occurred, and she declined to impose a constructive trust as to the

21

$50,000 in sale proceeds transferred to the first CD.

¶51.    The chancellor next considered Jackson's allegations that Mills improperly withdrew $17,581.25 from Harris's joint account for Mills's own personal use and benefit. In considering whether to impose a constructive trust as to the withdrawals, the chancellor found that Mills presented uncontroverted testimony that Harris knew about and consented to each transaction. In addition, the chancellor found that the withdrawn funds constituted a portion of the proceeds resulting from the sale of Tract III. As previously stated, the chancellor concluded that, but for the fact that Harris needed the proceeds from the sale of Tract III for her care and maintenance, Mills would have derived the full benefit of Tract III under Harris's will. Thus, the chancellor concluded that the evidence failed to justify the creation of a constructive trust as to the $17,581.25 Mills withdrew from Harris's joint account.

¶52.    Finally, the chancellor determined that no constructive trust should be imposed over the $47,000 Mills transferred to a second CD titled in the names of Harris, Mills, and Mills's daughter. The $47,000 resulted from the sale of Tract II. As stated in her will, Harris intended for Jackson to receive Tract II. However, prior to Harris's death, Mills, acting as Harris's attorney-in-fact, sold Tract II. According to Mills's testimony, Harris herself arranged for the sale of Tract II, and Mills only acted in accordance with Harris's instructions.

¶53.    The chancellor found that, by the time Harris sold Tract II, much of the proceeds from

the sale of Tract III had been depleted and that neither Harris nor Mills knew how much more financial support Harris would require during the remainder of her life. Based on her findings, the chancellor concluded that no abuse of a confidential relationship resulted from the sale of Tract II and the transfer of the proceeds to the CD. Instead, as with the other disputed transactions, the chancellor found that Harris authorized the transactions and even arranged the details of the sale herself.

¶54.    Upon review, we find the record contains substantial credible evidence to support the chancellor's findings that Harris authorized the transfer of the sale proceeds to the two CDs and authorized the withdrawals Mills made for her personal benefit. *See Davidson*, 667 So. 2d at 620. In addition, although the record establishes that a confidential relationship existed between Harris and Mills, the evidence fails to demonstrate that Mills abused the confidential relationship. Therefore, Jackson failed to satisfy her burden to prove by clear and convincing evidence that equity requires the imposition of constructive trusts in her favor. *See McNeil*, 753 So. 2d at 1064 (¶25). As a result, we find Jackson's assignments of error regarding these issues lack merit.

### VII.    Whether the chancellor erred by finding an ademption occurred as to the devise made to Jackson by Harris's will.

¶55.    In her final assignment of error, Jackson challenges the chancellor's finding that the sale of Tract II to Nichols caused an ademption of the devise made to Jackson by Harris's will. Jackson argues that Harris never authorized the sale of her residence. Instead, she contends that Mills, acting for her own personal benefit, disregarded Harris's testamentary

23

intent and sold the property without Harris's consent or knowledge. As a result, Jackson argues that the chancellor erred by finding that the sale of the land caused an ademption of the devise that Harris's will made to Jackson.

¶56. "For purposes of testamentary construction, it is the responsibility of a reviewing court to determine and respect the intent of a [testator]. [The appellate court] must review the decision of the chancellor to determine if effect was given to the [testator's] intent." *Miss. Baptist Found. Inc. v. Estate of Matthews*, 791 So. 2d 213, 219 (¶25) (Miss. 2001) (citations omitted). "Ademption typically occurs when a testator in his lifetime disposes of a piece of property he has specifically devised or bequeathed in his [w]ill. The effect is that the gift fails since the testator at his death did not own the property." *Id.* at 218 (¶20) (citation and quotation marks omitted).

¶57. In 1997, Harris executed her will. Pursuant to the will, Harris left to Jackson her residence, situated on about one acre of land. Harris also bequeathed to Jackson all the residence's furniture, furnishings, and fixtures, with the exception of all the personal property and furnishings in the residence's front bedroom, which Harris left to Mills. In 2006, Mills, acting as Harris's attorney-in-fact, sold Tract II, the land upon which Harris's residence was located. As a result, Harris no longer owned the land at the time of her death.

¶58. As previously discussed, we find the record contains substantial credible evidence to support the chancellor's findings that Harris arranged the sale of Tract II herself and that Mills merely acted pursuant to Harris's instructions. Therefore, we find no merit to

24

Jackson's contention that Mills disregarded Harris's testamentary intent and sold the property without Harris's consent or knowledge. Furthermore, because the conveyance of Tract II occurred during Harris's lifetime, the property no longer remained in Harris's possession at the time of her death. As a result, our caselaw clearly establishes that an ademption occurred as to the devise made to Jackson in Harris's will. *Estate of Matthews*, 791 So. 2d at 218 (¶20). We therefore find no merit to Jackson's argument to the contrary.

¶59. **THE JUDGMENT OF THE MADISON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, FAIR AND WILSON, JJ., CONCUR. JAMES, J., NOT PARTICIPATING.**